899 F.2d 905
 65 A.F.T.R.2d 90-1045, 90-1 USTC P 50,185
 Jack S. JAMES and Carol N. James; Glen E. Michael and Sybil
H. Michael; A.F. Boudreau, Jr., and Katherine F. Boudreau;
David G. Ownby and Kathleen Ownby; Jeffry H. Cope and Mary
E. Cope; and Robert S. Cope and Phyllis H. Cope,
Petitioners-Appellants,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent-Appellee.
 Nos. 87-1913, 87-1916, 87-1918, 87-1919, 87-1959, 87-1960
and 87-1961.
 United States Court of Appeals,
Tenth Circuit.
 March 26, 1990.
 
 Tom G. Parrott (Charles N. Woodward of Lisle & Woodward, with him on the briefs), Oklahoma City, Okl., for petitioners-appellants.
 Thomas R. Lamons, Atty., Tax Div. (William S. Rose, Jr., Acting Asst. Atty. Gen., Michael L. Paup and Ann Belanger Durney, Attys., Tax Div., with him on the brief), Dept. of Justice, Washington, D.C., for respondent-appellee.
 Before LOGAN, MOORE and TACHA, Circuit Judges.
 LOGAN, Circuit Judge.
 
 
 1
 Petitioners Jack James, Glen and Sybil Michael, A.F. Boudreau, Jr., David Ownby, Jeffrey Cope, and Robert Cope were investors,[1] either individually or through controlled entities, in joint ventures that purchased expensive computer systems already leased to large industrial corporations. These investors took deductions on their personal income tax returns for depreciation, for fees to the seller for continuing management services, and they took investment tax credits for purchases of the computer systems. The Commissioner of Internal Revenue disallowed the deductions and credits on the ground that the underlying transactions giving rise to these items were shams lacking economic substance. The United States Tax Court, in a unanimous reviewed decision, upheld the disallowances, agreeing that the transactions lacked economic substance. Jack S. James, 87 T.C. 905 (1986).[2] Because we affirm on this basis, we do not address the Tax Court's alternative holdings.
 
 
 2
 The Tax Court made detailed findings of fact which we summarize here as briefly as we can. Communication Associates, Inc., Communications Associates Leasing, Inc., and Communications Leasing International, Inc. (collectively the "Communications Group")[3] were related entities engaged in the business of purchasing computer equipment from manufacturers and leasing it to large-scale users that preferred to lease rather than buy their own equipment. In 1979 and 1980, petitioners Jack James and Glen Michael served as principal officers in certain of those companies.
 
 
 3
 On December 28, 1979, petitioners A.F. Boudreau, Jr., Glen and Sybil Michael, and Jack Jones, either individually or through controlled entities, formed a joint venture (JV# 1) for the stated purpose of investing in and leasing computer equipment. On that same date, JV# 1 and the Communications Group entered into three agreements: an agency agreement, an administrative services agreement, and a purchase agreement. In the agency agreement, JV# 1 appointed the Communications Group as its agent for purchasing computer equipment and leasing it to end users. The Communications Group was entitled to act for JV# 1 without disclosing its agency status, and JV# 1 was not liable in any manner on debt incurred by the Communications Group to finance the computer equipment purchases. The administrative services agreement stated that the Communications Group would perform various administrative tasks associated with the leasing of computer equipment purchased by JV# 1. For its services, the Group would receive annual management fees over a seven-year period starting at $72,000 and decreasing gradually to $39,600 in the fourth year.
 
 
 4
 In the purchase agreement, the Communications Group agreed to sell JV# 1 a computer system which the Group had purchased from Amdahl Corp. in June 1979 and had leased to Massey-Ferguson, Inc. The Communications Group financed the $3,211,000 purchase price by giving Amdahl an installment note payable in sixty-two monthly installments plus a balloon payment. The Group also gave Amdahl a security interest in the equipment.
 
 
 5
 The lease to Massey-Ferguson was also for a sixty-two-month term, providing for monthly rental payments commencing January 1, 1980, in an amount exactly corresponding to the Group's monthly obligations to Amdahl. The Communications Group assigned its right to receive monthly rental payments from Massey-Ferguson to Amdahl. The lease was a "net-net-net" or "triple net" lease whereby the lessee was responsible for installation, maintenance, taxes, and insurance.
 
 
 6
 JV# 1's purchase of the equipment was subject to Amdahl's security interest, Massey-Ferguson's lease, and the assignment of rental payments to Amdahl. JV# 1 paid $2 million for the equipment. Although it is not apparent from the purchase agreement itself, JV# 1's $2 million purchased only a 52.6% interest in the equipment, a markup of approximately 18.4% over 52.6% of the computer's original purchase price. The remaining interest in the computer was sold to other investors at approximately the same markup, giving the Communications Group total proceeds of $3,801,250.
 
 
 7
 JV# 1 financed this purchase by giving the Communications Group a demand note in the amount of $300,000, subsequently satisfied, and a recourse installment note for the balance of $1.7 million. JV# 1 also became obligated to pay the Communications Group a $150,000 implementation fee. In addition, the purchase agreement gave the Communications Group a "nonexclusive right to remarket" the computer equipment upon expiration or termination of the lease, under which the Group was entitled to twenty-five percent of the net proceeds of any remarketing they arranged.
 
 
 8
 The documentation surrounding JV# 1's purchase and annual statements from the Communications Group to JV# 1 described the computer equipment as serial number 70078 leased to Amdahl, while in fact, JV# 1's equipment was serial number 10055 leased to Massey-Ferguson. Both a sublease and a release of this equipment beginning in 1984 were at a monthly rental rate of less than ten percent of the monthly rental in the original lease.
 
 
 9
 In June 1982, the original administrative services agreement was cancelled and a restated administrative services agreement was executed which provided for income pooling. Under this arrangement, the Communications Group would pool all rental income from equipment it managed for JV# 1 and other investors and from its own computer equipment and then allocate the income to the various owners pursuant to a stated formula. JV# 1's share of pooled income was based on its proportionate investment in the total pool, adjusted by a "TR factor," which allegedly adjusted for equipment-specific differences such as useful life and maturity. The restated agreement also stated that the "normal rental rate" of JV# 1's equipment was equal to 21.619% of its investment. If JV# 1's share of the pooled income exceeded this rate, the Communications Group was entitled to retain the excess as a "performance fee." Further, the Group's annual management fees were revised and set at a flat rate of sixteen percent of adjusted pool rental income. The net effect of these provisions was to ensure that JV# 1's annual cash flow remained roughly at a break-even point during the term of the computer's lease, with cash inflows from rental income almost exactly (within pennies) offsetting cash outflows in satisfaction of JV# 1's various obligations to the Communications Group. In fact, in the three years before income pooling took effect the Communications Group inexplicably credited JV# 1, not for the actual rental payments made by Massey-Ferguson, but for rental income which exactly offset JV# 1's annual obligations to the Group, a discrepancy of nearly $100,000 in 1980.
 
 
 10
 On January 15, 1980, a second joint venture (JV# 2) was formed by amendment of the JV# 1 joint venture agreement, adding four new members--Robert Cope, Jeffrey Cope, David Ownby, and A.F. Boudreau, Jr., in his individual capacity. JV# 2 executed agency and administrative service agreements with the Communications Group similar to those in effect for JV# 1, except that JV# 2's administrative services agreement immediately used income pooling, normal rental rate, performance fee, and percentage management fee concepts subsequently used in JV# 1's restated administrative services agreement. The effect of these provisions was the same as for JV# 1; that is, JV# 2's annual cash flow was extremely close to breaking even.
 
 
 11
 The structure of the transactions culminating in the sale of computer equipment to JV# 2 was the same as that used with JV# 1. The Communications Group purchased three computer systems at a total cost of $3,305,284, financed through nonrecourse installment notes with different banks. The Group leased the systems to three different end users on a triple net basis for terms ranging from fifty-eight to eighty-four months and assigned the right to rental payments to the various financing banks. The Communications Group then sold the three systems, subject to the security interests, leases, and rent assignments, to JV# 2 for a purchase price of $3.8 million, an approximate fifteen percent markup over the Group's purchase price. JV# 2 gave the Group an $817,000 demand note and an installment note for the balance. JV# 2 satisfied the demand note and also paid the Communications Group a $57,000 implementation fee in December 1980. The Communications Group was again entitled to a twenty-five percent remarketing fee, but rather than the "nonexclusive right to remarket" it held on JV# 1's equipment, the Group had a "right of first refusal to remarket" JV# 2's equipment.
 
 
 12
 In June 1985, one of JV# 2's lessees declared bankruptcy and the bank holding the security interest in the computer equipment repossessed the equipment. The Communications Group repurchased the equipment from the bank at a price less than the principal balance remaining on its nonrecourse note to the bank. Nevertheless, JV# 2 continued its loan and other payments to the Group as originally scheduled.
 
 
 13
 Upon review of these transactions, the Tax Court concluded that, in substance, JV# 1 and JV# 2 merely purchased a package of tax benefits, not true ownership interests in the equipment. The court found and concluded that no true agency relationship existed between the joint ventures and the Communications Group; that many inexplicable anomalies in their relationship suggested that the joint ventures were not exercising the care reasonably expected of true owners; that the agreements between the joint ventures and the Group were designed to strip all potential cash flow from the joint ventures; and that even under the most optimistic projections of expected residual value, the joint venture could not reasonably expect a pretax profit from the purported purchases. It therefore upheld the Commissioner's disallowance of petitioner's depreciation and management fee deductions and investment tax credits because the nominal purchase by the joint ventures lacked economic substance.
 
 
 14
 * It is well established that transactions lacking an appreciable effect, other than tax reduction, on a taxpayer's beneficial interest will not be recognized for tax purposes. See Knetsch v. United States, 364 U.S. 361, 366, 81 S.Ct. 132, 135, 5 L.Ed.2d 128 (1960). A transaction will be accorded tax recognition only if it has "economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached." Frank Lyon Co. v. United States, 435 U.S. 561, 583-84, 98 S.Ct. 1291, 1303, 55 L.Ed.2d 550 (1978).[4]
 
 
 15
 The Tax Court has at times applied a two-prong standard for guiding a sham determination. See, e.g., Rice's Toyota World, Inc. v. Commissioner, 81 T.C. 184, 202-03 & n. 17, 209 (1983), aff'd in part, rev'd in part on other grounds, 752 F.2d 89 (4th Cir.1985). The Fourth Circuit has expressly adopted this two-prong standard requiring both a subjective and an objective inquiry, in that "[t]o treat a transaction as a sham, the court must find that the taxpayer was motivated by no business purposes other than obtaining tax benefits ... and that the transaction has no economic substance because no reasonable possibility of a profit exists." Rice's Toyota, 752 F.2d at 91-92. The better approach, in our view, holds that "the consideration of business purpose and economic substance are simply more precise factors to consider in the [determination of] whether the transaction had any practical economic effects other than the creation of income tax losses." Sochin v. Commissioner, 843 F.2d 351, 354 (9th Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 72, 102 L.Ed.2d 49 (1988).
 
 
 16
 In reviewing the Tax Court's decision in this case, we accept all factual findings that are not clearly erroneous. And, based upon these findings, we review de novo the ultimate characterization of the transactions as shams. See Frank Lyon, 435 U.S. at 581 n. 16, 98 S.Ct. at 1302 n. 16; Knetsch, 364 U.S. at 365, 81 S.Ct. at 134 (characterizing sham finding as conclusion of law); Newman v. Commissioner, 894 F.2d 560 (2d Cir.1990); Killingsworth v. Commissioner, 864 F.2d 1214, 1217 (5th Cir.1989) (substantive shams reviewable de novo); cf. Miller v. Commissioner, 836 F.2d 1274, 1277 (10th Cir.1988) (whether transactions were "entered into for profit" for purposes of I.R.C. Secs. 108 & 165(c)(2) reviewable de novo).[5] With these standards in mind, we turn to an analysis of the transactions at issue.
 
 II
 
 17
 The Tax Court expressly found that the purchase-and-lease transactions involving the Communications Group, the various computer equipment manufacturers, the financing banks, and the lessees of the computer equipment were legitimate transactions, negotiated at arm's length, reflecting competitive market terms. Petitioners argue that since the Communications Group was nominally their authorized agent in these legitimate transactions, it is inconsistent for the Tax Court to find that the portions of this arrangement involving the joint ventures lacked economic substance. This argument is fundamentally in error. First, the Tax Court found that although the relationship between the joint ventures and the Communications Group was labeled a principal-agent relationship, in substance the parties were principals acting for their own account. The court noted that the large markup on the "sales" between the Communications Group and the joint ventures was inconsistent with an agency relationship, especially since the Group did nothing to enhance the value of the computer equipment. The only service provided by the Group was arranging financing, and the court found that the Group was more than fully compensated for this service through the substantial implementation, management, and performance fees the joint ventures paid. The Tax Court also noted that when the Communications Group repurchased at a savings computer equipment that one of the financing banks had repossessed, it did not pass these savings on to its purported principal, JV# 2.
 
 
 18
 We agree with the Tax Court's conclusion that the relationship between the joint ventures and the Communications Group was inconsistent with a true agency. The parties were careful to structure their transactions separately, never allowing the Group to bind the joint ventures as their "agent." For example, the joint ventures expressly disclaimed any liability on debt incurred by the Group to finance purchases "on behalf of" the joint ventures. Rather, the Group incurred nonrecourse obligations and the joint ventures gave the Group recourse notes. This inured only to the benefit of the Communications Group, as evidenced by its savings on the repurchase of the repossessed equipment. Further, the Group never actually purchased equipment "on behalf of" the joint ventures, but instead executed separate purchase agreements with them. Although the joint ventures called the Communications Group their agent, the Group took no actions consistent with a true agency relationship. Therefore, they cannot claim that they were the principals in the Group's legitimate transactions.
 
 
 19
 The petitioners' argument misses the mark for another reason. They appear to claim that this entire "deal" must stand or fall in toto. But, as the Tax Court found, there was no one unitary "deal." Rather, there were many individual actors and many individual transactions. The only transactions at issue in this case are the purported sales by the Communications Group to the joint ventures. These sales cannot be legitimized merely because they were on the periphery of some legitimate transactions.
 
 
 20
 Along these same lines, petitioners contend that the Tax Court's opinion was improperly based on a legally unprecedented, novel, and unique "bifurcated sham transaction theory." If the Commissioner treats a transaction as a sham, petitioners argue, he cannot allow certain deductions or credits related thereto and disallow others--a transaction either is a sham or it is not. In the present case, the Commissioner allowed the petitioners to deduct certain interest and lease acquisition costs, as well as professional fees, associated with the joint ventures, but disallowed depreciation and management fee deductions and investment tax credits. The Commissioner also disallowed a current deduction of the implementation fees, but did allow them to be amortized over five years. Petitioners maintain that by allowing the joint ventures to deduct these expenses, the Commissioner has effectively conceded that the subject transactions have economic substance and business purpose.
 
 
 21
 The "bifurcated transaction" approach does have a basis in established law, however. As the Fourth Circuit held in Rice's Toyota, "a sham transaction may contain elements whose form reflects economic substance and whose normal tax consequences may not therefore be disregarded." 752 F.2d at 96 (allowing interest deductions on recourse debt even though underlying transaction was a sham); see also Bail Bonds by Marvin Nelson, Inc. v. Commissioner, 820 F.2d 1543, 1549 & n. 6 (9th Cir.1987). We agree that within the framework of a sham transaction a taxpayer may incur bona fide obligations which should be recognized for tax purposes. Here the Commissioner did not err in allowing the joint ventures' interest deductions on their recourse debt along with certain other payments to outside parties.
 
 
 22
 More troubling, however, is the Commissioner's acquiescence in the petitioners' amortization of the so-called implementation fees. Given its view that the purported sale was without substance, it seems inconsistent to treat those fees as bona fide obligations. Nevertheless, we do not accept that the Commissioner has conceded the transactions at issue had economic substance merely because it handled one item in a questionable manner. Petitioners have not shown that they were in any way prejudiced by the Commissioner's conduct. In fact, they derived an otherwise unavailable benefit in the amount of the allowed deductions.
 
 
 23
 The Tax Court considered many facts which pointed to a lack of substance in the "sales" between the Communications Group and the joint ventures. Although the joint ventures purported to own the computer equipment, they did not exercise the care that would be expected from owners of multimillion dollar computer systems. Documentation and annual statements regarding the 1979 "purchase" by JV# 1 incorrectly identified the serial number, lessee, and location of the equipment for several years, information which petitioner Jack James admitted at trial is very important to investors in computer equipment. Yet, these errors were not discovered until preparation for the trial in this case. II James R. at 119-20. The parties were not diligent enough in negotiating the 1979 "sale" to note in the purchase agreement the percentage interest sold. In addition, the Tax Court noted large discrepancies between actual rental payments and rental income allocated to JV# 1 before income pooling began. Although owners of equipment would presumably be most concerned with the income from their investment, the court noted that there was no explanation for these discrepancies.
 
 
 24
 The joint ventures paid fifteen percent and eighteen percent markups over the prices at which the Communications Group purchased the computer equipment. As noted previously, the Tax Court could find no justification for these substantial markups, especially in light of the substantial "fees" which the joint ventures also paid the Group. Obviously unjustified markups are a potent indicator that a purported sale serves no function other than to provide the "purchaser" with inflated tax benefits. See Rice's Toyota, 752 F.2d at 93 (sale and leaseback).
 
 
 25
 The Tax Court also found that the "sales" to the joint ventures were structured to deprive the joint ventures of any reasonable possibility of economic profit apart from potential tax savings. As noted previously, the net effect of income pooling, with payment of a performance fee in the amount of all income in excess of the stated normal rental rate, was to strip all potential positive cash flow out of the hands of the joint ventures for the benefit of the Communications Group, while at the same time assuring that cash flow would not be negative in any year. Therefore, the joint ventures would not be required to put up any more money. And even before income pooling was implemented for JV# 1, the mysterious rental income discrepancies achieved this same effect. The Tax Court could find no evidence that would justify the substantial management and performance fees. Petitioner A.F. Boudreau's accountant and consultant, who purportedly analyzed these transactions for Boudreau, testified at trial that the decision to set the management fee at sixteen percent had no basis. II James R. at 189. The Tax Court found that the sole function of the substantial management and performance fees was to strip cash flow from the joint venture. Petitioners cite several authorities for the proposition that the absence of a significant positive cash flow during the term of a lease should be considered a neutral factor. While this may be true as far as it goes, when lack of cash flow is created by extraordinary management fees and inflated purchase prices and guaranteed through the provision of stop-gap performance fees, any element of neutrality rapidly dissipates.
 
 
 26
 Because the joint ventures were assured no positive cash flow over the lives of the equipment leases, their only chance of recovering their initial investments, other than through hoped-for tax benefits, was through the residual value of the computers. See Rice's Toyota, 752 F.2d at 92-93 (where cash flow over life of lease was negligible, crucial focus for profitability of purported sale-leaseback was expected residual value). The parties stipulated at trial that at the time of each alleged purchase, the range of reasonable expected residual values for all of the equipment at issue was between zero and thirty-five percent of the manufacturers' original sale prices. Based on its own computations, the Tax Court found that even using the most optimistic expected residual value, each joint venture could reasonably expect losses in excess of $6,000.
 
 
 27
 The petitioners challenge the accuracy of these computations. Petitioners first contend that the Tax Court erroneously deducted the twenty-five percent remarketing fee in the expected profit calculations, since the Communications Group's right to remarket the computers was nonexclusive and the joint ventures may have remarketed them on their own or found someone else to do it for a smaller fee. Petitioners stress that two members of the joint ventures served as principal officers in the Communications Group, and, therefore, they could protect the joint ventures' interests in this regard. But petitioners ignore the potential conflict of interests inherent in such an arrangement. We believe that the Tax Court's treatment of the remarketing fee was reasonable. Given the joint ventures' lack of supervision over the Communications Group's day-to-day handling of the transactions, the Tax Court could well have concluded that, in a situation in which the joint ventures were already paying exorbitant fees to the Communications Group, at the end of each lease term the joint ventures would not intervene suddenly in an attempt to minimize a cost that would provide another desirable tax deduction. This conclusion is even more appropriate in the case of JV# 2, in which the Group held a "right of first refusal" to remarket. Moreover, petitioners advance little reason to believe that James and Michael would have stood guard to ensure that the joint venture saved money at the expense of the Communications Group. The Group's failure to pass on the savings of the repurchased computer to JV# 2 compels the opposite conclusion.
 
 
 28
 Petitioners next argue, with respect to JV# 1 only, that the Tax Court erred in calculating expected pretax profit by in effect deducting the $150,000 implementation fee twice. Petitioners failed to place in the record before the Tax Court any indication of how the implementation fee was financed. 87 T.C. at 909. Accordingly, the court simply deducted the amount of the fee in its calculations. The court also deducted payments of $30,811.51 on a promissory note executed December 27, 1979. The record indicated neither the purpose nor the principal amount of the note. On appeal, petitioners for the first time argue that these payments represented annual installments on the promissory note through which the implementation fee was financed. On this basis petitioners claim error.
 
 
 29
 Petitioners concede that they cannot rely on the alleged promissory note on appeal under Fed.R.App.P. 10(e). They invite this court to piece together bits of "circumstantial evidence" to infer the existence of this document, and then to conclude that the Tax Court erred in failing to divine the intent of their unexplained payments. Their argument is entirely unpersuasive. The Tax Court's conclusions were reasonable on the basis of the record before it, and they must stand on that basis.
 
 
 30
 AFFIRMED.
 
 
 
 [1]
 Petitioners Carol James, Katherine Boudreau, Kathleen Ownby, Mary Cope and Phyllis Cope are parties solely because they signed joint income tax returns with their spouses for the relevant years
 
 
 [2]
 The Tax Court's opinion purported to address only the challenged investment tax credits and management fees deductions. 87 T.C. at 906. But both petitioners and the Commissioner contend, and it is apparent from the record, that the challenged depreciation deductions were also at issue before the Tax Court and remain at issue on appeal. See Brief for Appellants at 12, 18-19; Brief for Appellee at 15-16 & n. 18
 
 
 [3]
 The term "Communications Group" will also be used to encompass Mentco Corporation, the company that assumed responsibility for the administration and management of the Communications Group's portfolio of leases in 1981
 
 
 [4]
 While most courts refer to these principles under the general heading of the sham transaction doctrine, some courts reserve the term "sham," as did the Tax Court in this case, see 87 T.C. at 918, for transactions which occur only on paper or do not, in fact, occur. Other courts distinguish between the mere paper chase, calling it a factual sham, and transactions which do occur but lack economic substance, so-called substantive shams. See, e.g., Killingsworth v. Commissioner, 864 F.2d 1214, 1216 & n. 3 (5th Cir.1989); Kirchman v. Commissioner, 862 F.2d 1486, 1492 (11th Cir.1989). The Commissioner does not contend that the transactions at issue were factual shams
 
 
 [5]
 Some circuits treat sham determinations as questions of fact. See, e.g., Keane v. Commissioner, 865 F.2d 1088, 1090 (9th Cir.1989); Rice's Toyota, 752 F.2d 89, 92 (4th Cir.1985); Comdisco, Inc. v. United States, 756 F.2d 569, 575 (7th Cir.1985); cf. Kirchman v. Commissioner, 862 F.2d 1486, 1490 (11th Cir.1989) (sham determination normally a fact question, but reviewed de novo because Tax Court assumed it was legal conclusion). But see American Realty Trust v. United States, 498 F.2d 1194, 1198-99 (4th Cir.1974) (cited with approval in Frank Lyon ); Swift Dodge v. Commissioner, 692 F.2d 651, 652 (9th Cir.1982) (citing Frank Lyon ). In our view, this approach is inconsistent with Frank Lyon, 435 U.S. at 581 n. 16, 98 S.Ct. at 1302 n. 16