HARRY J. STAHL AND THEODORA G. STAHL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Stahl v. Commissioner
Docket No. 29441-85
United States Tax Court
T.C. Memo 1990-320; 1990 Tax Ct. Memo LEXIS 337; 59 T.C.M. (CCH) 1003; T.C.M. (RIA) 90320; June 26, 1990, Filed *337 Decision will be entered under Rule 155. Eugene L. Wilpon and Larry Kars, for the petitioners. Phoebe L. Tang and Roger L. Kave, for the respondent. SWIFT
MEMORANDUM FINDINGS OF FACT AND OPINION Respondent determined deficiencies in petitioners' Federal income taxes and additions to tax as follows: Additions to Tax or Interest, I.R.C. Sec. [1]
Year
Deficiency
6653(a)
6621(c)
1979
$ 33,149.00
$ 1,657.45 *
1980
26,529.00
1,326.45 *
*338 The primary issues for decision are: (1) Whether a partnership investment in computer software was a sham, lacking in economic substance, and (2) whether the partnership investment was made for profit. FINDINGS OF FACT Many of the facts have been stipulated and are so found. Petitioners resided in Honolulu, Hawaii, at the time they filed their petition in this case. In late 1979, petitioner Harry J. Stahl ("petitioner") agreed to purchase for $ 32,000 a limited partnership unit in Pacific Systems Ltd. ("Pacific Systems"), a Florida limited partnership. Pacific Systems was formed on December 31, 1979, with the stated purpose of investing in and marketing computer software systems. In 1979, petitioner contributed $ 20,000 in cash to the partnership and signed a $ 12,000 recourse promissory note in favor *339 of the partnership for the balance of the $ 32,000 due under the subscription agreement. The $ 12,000 promissory note, with interest at nine percent, was due in four equal installments to be paid on the first day of February, May, August, and November of 1980. With respect to his investment in Pacific Systems, petitioner received a 7.692-percent profits-and-loss interest in the partnership and an allocation to him of partnership basis in the amount of $ 506,247, which basis arises primarily from the partnership's nonrecourse debt obligations described below. On his 1979 Federal income tax return, petitioner claimed, with respect to the 1979 investment in Pacific Systems, an $ 827 deduction for depreciation of the software systems, an $ 8 deduction for organizational expenses of the partnership, and a $ 34,970 investment tax credit based on the stated cost of the software systems. Also with respect to the 1979 investment in Pacific Systems, on their 1980 joint Federal income tax return, petitioners claimed an ordinary loss deduction of $ 31,012 and an investment tax credit carryover from 1979 of $ 10,211. Petitioner is a sophisticated businessman. He has experience in analyzing *340 business investments and is a successful real estate consultant and developer of resort and condominium properties. Prior to his investment in Pacific Systems, however, petitioner did not investigate in a normal, businesslike manner any aspect of the proposed investment other than the tax benefits. As explained in the offering memorandum, Pacific Systems was to purchase or license seven computer software systems or programs from Continental Systems Corporation ("Continental") for the purpose of reselling or sublicensing the software systems to companies doing business only within 24 specified industry groups and to companies located only in specified marketing territories within the United States. The stated purchase price for the purchase by Pacific Systems of the computer software systems from Continental was $ 6,865,000, consisting of cash of $ 127,800, the assumption by Pacific Systems of Continental's liability on certain nonrecourse promissory notes in the amount of $ 6,581,000, and the assignment by Pacific Systems to Continental of the limited partners' recourse promissory notes to Pacific Systems in the total amount of $ 156,000. The seven computer software systems *341 consisted of seven very general accounting or general ledger systems. As explained, under the software purchase agreement with Continental, Pacific Systems acquired the right to resell or sublicense the software systems only within certain specified territories or states and only to companies within each territory or state within the specified industry groups as follows: Industry Group
States
Advertising
North and South Carolina
Alcoholic Beverage
South Carolina
Athletic Equipment Mfg.
Arkansas
Automotive Parts
South Carolina
Commercial Art & Design
South Carolina
Condominium Management
South Carolina
Costume Jewelry Mfg.
South Carolina
Engineering/Architecture
South Carolina
Furniture
South Carolina
Legal Services
Illinois
Lumber/Construction
South Carolina
Messenger Service
South Carolina
Metal Stamp Mfg.
North and South Carolina
Misc. Repairs/Parts
North Carolina
Motorcycle Sales
South Carolina
Paper Products
South Carolina
Plastic Products
North Carolina
Plumbing/Heating
South Carolina
Recreation Services
North Carolina
Toys and Games Mfg.
North and South Carolina
Trucking/Warehousing
North Carolina
Wholesale Drugs
North and South Carolina
Wholesale Grocery
Illinois
Wholesale Durable Goods
Rhode Island
*342 As indicated, at the time of purchase by Pacific Systems, the seven computer software systems were merely general accounting systems. The systems had not been modified or customized in any way to process information or transactions unique to the industry groups within which the software systems were to be marketed. Also, the computer software systems purchased by Pacific Systems from Continental were designed to be used only on Data General Nova 2 or 3 central processing units and only with a MICROS operating system. Data General Nova 2 and 3 computers, however, generally were sold with a RDOS operating system, a system on which the software systems purchased by Pacific Systems would not operate without first being totally reprogrammed. Thus, the computer software systems purchased by Pacific Systems were not readily or immediately usable by most of the owners or licensees of Data General Nova 2 and 3 computers. Also, by 1979, the Data General Nova 2 computer was approaching economic obsolescence. The cost and time of customizing the seven general computer software systems for the different industry groups would be very substantial, and the adaptation of the software systems *343 so that they could be used on computers with operating systems other than MICROS operating systems would necessitate an expensive and time consuming rewrite of most of the software systems. The Pacific Systems' offering memorandum disclosed that Continental was a newly formed company and had no experience with computer software systems. The offering memorandum disclosed that Continental had purchased the software systems from Adams Minicomputer Services, Inc. ("Adams Minicomputer"), but the offering memorandum did not disclose the price Continental had agreed to pay Adams Minicomputer for the software systems. The Pacific Systems offering memorandum disclosed that the partnership had agreed to market the computer software systems to companies within the states and industries mentioned above through a distribution and marketing agreement with Systems Distributors, Inc. ("Systems Distributors"), an affiliated company of Adams Minicomputer, that Systems Distributors had recently been formed, that it had limited resources and personnel, that it had made no sales outside the New York City Metropolitan area, and that no sales had yet been made on behalf of Pacific Systems or any of *344 the other related partnerships that were formed in 1979 to sell the software programs in other territories. Further, with regard to the marketing of the software programs, the Pacific Systems' offering memorandum explained as follows: The [computer software] Systems embody a type of computer program known as application software which is intended to provide generalized programming instruction for definable purposes. There are many other companies of larger size which have significantly greater financial resources and experience than does the Adams Companies, which are developing application software. Such companies may have the expertise and market penetration to compete effectively with the programs contained in the Systems or to totally dominate the markets to which any System is directed. [Emphasis in the original.]
Conspicuous in the offering memorandum of Pacific Systems were the following caveats: This offering involves a high degree of risk and should only be considered by investors who can afford to lose their entire investment.
and No projections and predictions are contained in this private offering memorandum because of *345 the impossibility of predicting future income.
The general partner of Pacific Systems was Andrew J. Roach. Mr. Roach had no prior experience in the computer industry. Simultaneously with the formation of Pacific Systems and the 16 other similarly structured partnerships that were formed by the promoters of Pacific Systems, Adams Minicomputer sold the rights to sell and license the computer software systems to Continental for a total price of $ 723,745 in cash and $ 77,349,078 in nonrecourse promissory notes. The computer software systems were then immediately resold to the various partnerships, including Pacific Systems, for significantly more cash and the assumption by the various partnerships of their share of the $ 77,349,078 nonrecourse promissory notes of Continental to Adams Minicomputer. With regard specifically to the cash paid with respect only to that portion of the computer software systems purchased by Continental and resold immediately to Pacific Systems, Continental paid Adams Minicomputer $ 65,000 in cash for software systems immediately resold to Pacific Systems for $ 283,800 in cash. Adams Minicomputer generally sold its computer software systems *346 directly to end-user companies for all or mostly all cash. The officers of Adams Minicomputer did not seriously regard the $ 77,349,078 nonrecourse debt obligations (that Adams Minicomputer was owed by Pacific Systems and the other partnerships through their assumptions of the nonrecourse promissory notes of Continental to Adams Minicomputer) as part of the true sales price to Continental or to the partnerships of the computer software systems. Adams Minicomputer realized a large profit on the sale to Continental just from the cash received on the sales and without regard to enforceability and receipt of payments on the nonrecourse notes. Pacific Systems entered into a vague, non arm's-length agreement with Systems Distributors, Inc. ("SDI") for SDI to market on behalf of the partnerships the software systems within the States and industry groups indicated above. SDI was an affiliated corporation of Adams Minicomputer and did little to market the systems. The structure and terms of the purchase agreement between Continental and Adams Minicomputer and between the partnerships and Continental and the promotion of the investments in the partnerships were largely the brainchild *347 of Milton Wilpon and Jonathan Reisman, each of whom was engaged primarily in promoting tax shelters, and together they controlled Continental. No negotiations occurred on behalf of the partnerships in determining the stated purchase price for the purchase of the software systems from Continental. Mr. Roach, as general partner of Pacific Systems, did not negotiate any aspect of the purchase of the software systems, identification of the industry groups, or the territories to be included in the software packages sold to Pacific Systems. Mr. Roach never inquired whether and at what price he, on behalf of Pacific Systems, might be able to purchase the software systems directly from Adams Minicomputer, nor whether comparable accounting systems were available from other sources. Mr. Roach never saw the computer software systems tested, nor did he observe them running on any computer. Although the marketability of business computer software systems is significantly related to the degree of end-user support that is made available to purchasers of the systems, no viable end-user support system was established by Pacific Systems, Continental, or Adams Minicomputer with respect to the *348 computer software systems involved in this case. Also, no technical end-user documentation or manuals were available to purchasers of the systems. Prior to and during trial, not a single copy of any of the computer software systems purchased by Pacific Systems or the other related partnerships could be located. None was available for demonstration by or for the attorneys, the Court, or most importantly for the parties' expert witnesses. Prior to formation of Pacific Systems, Wilpon or Reisman obtained an appraisal of the software systems to be purchased by the partnerships from Continental. The appraiser was informed of the purchase price the partnerships were to pay for the software systems before he rendered his appraisal. From 1979 through 1982, Pacific Systems, using the accrual method of accounting, reported the following losses and income on its partnership information tax returns: Year
Losses
Income
1979
($    10,858)
-0-
1980
($ 1,978,229)
$ 2,033
1981
($ 1,421,976)
-0-
1982
($ 1,026,644)
$ 2,649
The nominal income reported by Pacific Systems in 1980 and 1982 was attributable to interest income. As of the date of trial, *349 neither Pacific Systems nor any of the other related partnerships has received any income from the sale of the computer software systems. Respondent's expert witness, utilizing the income capitalization approach, determined that the computer software systems purchased by Pacific Systems had a zero value. He relied primarily on the fact that no viable marketing structure was established for sale of the systems, that the systems were not adequately customized for the industry groups to be salable, and that the systems had limited utility because they could only be used on the Data General Nova 2 and 3 machines utilizing MICROS operating systems. OPINION Transactions that have no economic substance, that have no realistic possibility of making a profit, and that have no legitimate business purpose will be considered shams and will not be recognized for Federal income tax purposes. Frank Lyon Co. v. United States, 435 U.S. 561, 583-584 (1978); (1978); Rice's Toyota World, Inc. v. Commissioner, 752 F.2d 89, 91 (4th Cir. 1985), affg. on this issue 81 T.C. 184, 209 (1983). *350 See Shriver v. Commissioner, 899 F.2d 724 (8th Cir., Mar. 28, 1990), affg. a Memorandum Opinion of this Court; James v. Commissioner, 899 F.2d 905 (10th Cir., Mar. 26, 1990), affg. 87 T.C. 905 (1986); Sochin v. Commissioner, 843 F.2d 351, 354 (9th Cir. 1988), affg. 85 T.C. 968 (1985).An inquiry into the economic substance and business purpose of transactions is inherently factual. Larsen v. Commissioner, 89 T.C. 1229, 1252 (1987), on appeal (9th Cir., Dec. 12, 1988), and cases cited. Petitioners bear the burden of proof on this issue. Welch v. Helvering, 290 U.S. 111 (1933); Rule 142(a). The losses, deductions, and credits in question in this case also must be supported by an actual and honest profit objective. Levy v. Commissioner, 91 T.C. 838, 871 (1988); Flowers v. Commissioner, 80 T.C. 914, 931 (1983); Siegel v. Commissioner, 78 T.C. 659, 698-699 (1982); Dreicer v. Commissioner, 78 T.C. 642, 646 (1982), *351 affd. without published opinion 702 F.2d 1205 (D.C. Cir. 1983); Brannen v. Commissioner, 78 T.C. 471, 505 (1982), affd. 722 F.2d 695 (11th Cir. 1984); Lemmen v. Commissioner, 77 T.C. 1326, 1340 (1981). Relevant factors in determining whether an activity is engaged in for profit are set out in section 1.183-2(b), Income Tax Regs. See Fox v. Commissioner, 80 T.C. 972, 1007 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984). [2]
Based upon the above law and the facts of this case, it is clear that the purported purchase of the computer software systems by Pacific Systems had no economic substance and was a sham, and that Pacific Systems' *352 investment in the transaction was not based on an actual and honest profit objective. The cash downpayments and the payments on the recourse promissory notes by the limited partners presented merely fees for the purchase of tax benefits. The nonrecourse debt obligations assumed by the limited partners was a sham, ignored by the parties, and will be ignored by us. The price to be paid by Pacific Systems reflected a gross overvaluation of the computer software systems and effectively precluded the partnership from ever making a profit on the investment. The systems were not sufficiently customized to be marketable to or usable by companies within the various industry groups to which they were to be marketed. For the reasons stated by respondent's expert, we generally agree with respondent's expert that the computer software systems had little or no value. For those systems, Pacific Systems agreed to pay Continental $ 6,865,000. The general partner was not qualified to manage the investment or to determine the economic soundness and reasonableness of the key features of the transaction. The promoters were tax shelter traffickers, who had little apparent interest in putting *353 together a transaction that had some realistic possibility of earning a profit for the investors. The transaction was not negotiated in any meaningful manner. The appraiser hired by the promoters at the time of the transaction did not make a meaningful, independent evaluation of the computer software systems. No viable end-user support system was established. The marketing agreement was completely inadequate. Efforts made in subsequent years to convert some of the software systems so that they would be compatible with the Apple Lisa computer are not sufficient to cure the many obvious and gross defects in this transaction and do not give economic substance to the transaction. It is clear that the investment by Pacific Systems had no legitimate business purpose or profit objective and must be regarded for Federal income tax purposes as a sham. Accordingly, the tax deductions, losses, and credits claimed by Pacific Systems and passed on to petitioner and to the other limited partners of Pacific Systems are disallowed in their entirety. In light of our conclusion on the sham and profit objective issues, it is not necessary to address other alternative arguments made by respondent. *354 For the reasons stated, the additions to tax and interest also are sustained. The section 6621(c) increased interest, as amended in 1984 by the Deficit Reduction Act of 1984, Pub. L. 98-369, sec. 155(c)(1)(A), 98 Stat. 693, and sec. 144(a) and (c), 98 Stat. 682, is applicable. Stanley Works v. Commissioner, 87 T.C. 389, 413-421 (1986). Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and as in effect for the years in issue. * 120 percent of the interest due on the deficiency.↩
2. In McIntyre v. Commissioner, T.C. Memo. 1988-97↩, we applied the above law to the facts of a transaction very similar to the instant transaction and concluded that the transaction was not supported by a profit objective.