**John F. JACKSON, Jr., and Shirley Jackson, Petitioners–Appellants,**

**v.**

**COMMISSIONER OF INTERNAL REVENUE, Respondent– Appellee.**

**No. 91–9017.**

United States Court of Appeals, Tenth Circuit.

June 10, 1992.

Richard R. Helmick, Kailua–Kona, Hawaii, for petitioners-appellants.

Gilbert S. Rothenberg, Atty., Tax Div., Dept. of Justice, Washington, D.C. (Shirley D. Peterson, Asst. Atty. Gen., and Gary R. Allen, David I. Pincus, and Roger E. Cole, Attys., Tax Div., Dept. of Justice, Washington, D.C., on the brief), for respondent-appellee.

Before SEYMOUR and TACHA, Circuit Judges, and BENSON,* District Judge.

SEYMOUR, Circuit Judge.

Petitioners John and Shirley Jackson appeal the judgment of the United States Tax Court upholding the Commissioner's refusal to allow a claimed $15,500 deduction for the 1982 tax year. The Tax Court held that the transaction underlying the deduction was a sham, not recognizable for tax purposes. See I.R.C. § 6621(c) (1988).[1] The court relied heavily on its prior opinion in *Moore v. Commissioner*, 85 T.C. 72 (1985). On appeal, the Jacksons argue that the Tax Court failed to distinguish their case from *Moore* and that this failure requires reversal. We disagree and affirm.

As in *Moore*, this case involves an elaborate jewelry distribution network. Persons like the Jacksons were invited to purchase "territorial distributorships" from U.S. Distributors, Inc. A territorial distributor enjoyed the exclusive right to distribute American Gold & Diamond Corporation's product within a specified territory. American Gold & Diamond is described in the documents supporting these transactions as a manufacturer of gold jewelry and an acquiror of gems and jewelry. *See* Addendum to Appeal Brief of Appellants, Exhibit 5–E, at 5. U.S. Distributors had a fifty year (beginning July 1, 1979) exclusive right to distribute that product world-wide. In *Moore*, the Tax Court noted that American Gold & Diamond had neither a ready

supply of product, nor established goodwill, and that it was founded and operated by the same persons responsible for U.S. Distributors. Thus, the court concluded that the world-wide exclusive right, pieces of which were sold to the territorial distributors, had no economic substance and was in fact a sham. *Moore*, 85 T.C. at 100–01.

In 1982, the Jacksons were informed of the possibility of purchasing a territorial distributorship by Lawrence Chapman, who had previously advised the Jacksons concerning investments in certain mutual funds. At that time, both Jacksons were employed in the family business, J & J Welding, a custom welding and repair operation. Mr. Jackson ran the welding business itself, and Mrs. Jackson was the firm's bookkeeper. Both Jacksons turned fifty-five in 1982 and testified that, because of the physically taxing nature of the welding business, they had begun to discuss seeking other employment. Mr. Jackson testified that jewelry distribution seemed particularly alluring because:

> "I knew that ... there was a—usually a tremendous markup on jewelry as it was sold, and if I remember correctly back in that time was when the—you might say the rage of everyone buying gold chains and wearing them was a sort of a fad, and this was one of the things we mentioned, that we could possibly getting into selling these chains."

Rec., vol. II, at 23.

Assertedly with this possibility in mind, the Jacksons signed a contract for the purchase of a territorial distributorship in December of 1982. The contract did not specify the territories to be assigned, but allowed the Jacksons to indicate their preferences.[2] They did, requesting several cities in Colorado, and West Springfield, Missouri. Their first choice among foreign

---

* The Honorable Dee V. Benson, United States District Judge, United States District Court for the District of Utah, sitting by designation.

1. The Tax Court also held that the Jacksons were liable for an increased rate of interest, pursuant to section 6621(c). On appeal, the Jacksons do not ask us to consider the interest penalty separately. *See* Brief of Appellants at

28. Accordingly, we address only whether the underlying transaction was a sham for tax purposes.

2. The contract required them to choose one in-state city or town, one out-of-state locality, and one territory in a foreign country.

territories was Jerusalem. The territories were not assigned by U.S. Distributors until February 1983, at which point the Jacksons were granted the rights to: (1) Fort Collins, Colorado; (2) West Springfield, Massachusetts; and (3) Ramat Gan, Israel. Fort Collins was the Jacksons' seventh choice among cities inside of Colorado, and the West Springfield they were assigned was not the West Springfield they sought. The record does not indicate that they ever complained about the territories assigned to them.

The Jacksons did not get something for nothing. Instead, they spent real money for the ephemeral rights granted by the contract they signed. At the time of contracting, the Jacksons wrote three checks: one for $15,000 payable to Professional Escrow Services, Inc.; another for $3,000 payable to Gem–Mart Joint Venture; and the third for $500 payable to Gem–Mart Consultants, Inc. The Tax Court found that the documents signed by the Jacksons obligated them to pay $720,000 for the territorial distribution rights.[3] Soon after the transaction, the Jacksons received a proposed Schedule C in the mail, which suggested that they claim a deduction of $60,000 on their 1982 tax return (a four-for-one tax write-off).

When they showed their long-time accountant, Norman Gardenswartz, their 1982 tax documents, including the Schedule C, he refused to file a return with the proposed deduction because he believed it was an abusive tax shelter, rather than a legitimate jewelry distribution business. Mr. Gardenswartz filed for an extension of time for the Jacksons to file their tax return and then set about trying to extricate the Jacksons from the arrangement with U.S. Distributors. He eventually decided to go to the I.R.S. with his information about the gem distribution scheme, scheduling a meeting in Denver with an I.R.S. agent and Mr. Jackson. After that meeting, Mr. Gardenswartz prepared the Jacksons' tax return, including a revised Schedule C claiming deductions for a $15,000

distribution fee and a $500 consulting fee. The Commissioner did not allow these deductions, the Tax Court affirmed, and the Jacksons now appeal.

"In reviewing the Tax Court's decision in this case, we accept all factual findings that are not clearly erroneous. And, based upon these findings, we review de novo the ultimate characterization of the transactions as shams." *James v. Commissioner*, 899 F.2d 905, 909 (10th Cir.1990). Only a transaction that has "economic substance which is compelled or encouraged by business or regulatory realities, is imbued with tax-independent considerations, and is not shaped solely by tax-avoidance features that have meaningless labels attached" will be recognized for tax purposes. *Frank Lyon Co. v. United States*, 435 U.S. 561, 583–84, 98 S.Ct. 1291, 1303–304, 55 L.Ed.2d 550 (1978). Here, the Tax Court concluded that whatever the taxpayer's asserted motivation, the exchange itself was so lacking in economic substance as to be a sham.

First, we note that the Jacksons do not argue that any of the Tax Court's fact findings are clearly erroneous. Instead, they argue everywhere that the Tax Court's reliance on *Moore* amounted to a wholesale adoption of the fact findings made there and a failure to make independent findings in this case. *See, e.g.*, Reply Brief at 1–3. We have reviewed the record and disagree with the Jacksons' characterization of the Tax Court opinion in this case. The Tax Court heard lengthy testimony from both Jacksons and Mr. Gardenswartz. Its opinion contains nine pages of fact findings, all of which are directly connected to the specific facts of this case. The reliance on *Moore* of which the Jacksons complain relates to the court's conclusion that the underlying transaction here is a sham.

■ The Jacksons argue that unlike the investors in *Moore*, they really were seeking a business opportunity, and they just happened to fall into this trap. Several

---

**3.** The payments were to be made over time through a combination of no interest recourse and non-recourse notes, with no actual payment

obligation until after the year 2000. *See* T.C. Memo at 10.

facts belie this contention. First, the Jacksons signed their contract for unspecified territories, indicating that the actual localities to which they were assigned made absolutely no difference in their calculation of the value of the distributorship. It simply cannot be that rights to Fort Collins are of the same value as rights to Denver, unless the exclusive rights package itself is not the reason for the transaction. Next, the Jacksons conducted no investigation of the jewelry business whatsoever and did not seek to discover the value of the distributorship they purchased, *see* rec., vol. II, at 47. Finally, documents in the Jacksons' possession revealed the nature of the distributorship scheme so plainly that Mr. Gardenswartz immediately refused to claim the proposed deduction.

The Jacksons contend that their belief that this was a genuine business opportunity is sufficient to create economic substance. Like the Tax Court, "[w]e have never held that the mere presence of an individual's profit objective will require us to recognize for tax purposes a transaction which lacks economic substance." *Cherin v. Commissioner*, 89 T.C. 986, 993 (1987). Instead, we "consider[ ] both the taxpayers' subjective business motivation and the objective economic substance of the transactions in making [a] sham determination[ ]." *Casebeer v. Commissioner*, 909 F.2d 1360, 1363 (9th Cir.1990); *see Bohrer v. Commissioner*, 945 F.2d 344, 348 n. 5 (10th Cir. 1991) (noting that either lack of profit motive or lack of economic substance can render a transaction a sham). Here, the Tax Court relied heavily on the identity of the schemes in this case and in *Moore*, and held that since the underlying entities were the same, the underlying scheme was still lacking in economic substance. We agree.

Several factors support the characterization of this transactional scheme as a sham. First, the entities involved had no longstanding involvement in the jewelry business and no goodwill. Next, the documents describing the transactions emphasized the tax benefits. Third, the financing structure, interest free notes to be paid far in the future, was unrealistic. The exclusive distributorship was devoid of substance because the central entity had no demonstrated source of product. *See Moore*, 85 T.C. at 101–02; *see also, Nickeson v. Commissioner*, 962 F.2d 973, 975 (10th Cir.1992). Each of these observations is supported by the facts found in this case. On de novo review, we conclude that the transaction was a sham and that the Jacksons are not entitled to their claimed deductions. For us, as for the Tax Court, *Moore* provides legal support for this conclusion.

The Jacksons argue further that, irrespective of the underlying transaction, the deduction should be allowed under the "bifurcated transaction" approach adopted in *James*. Reply Brief at 3–4. As this court noted in that case, "within the framework of a sham transaction a taxpayer may incur bona fide obligations which should be recognized for tax purposes." 899 F.2d at 910. In *Moore*, some actual jewelry transactions with third parties took place, and the Tax Court held that expenses connected to those legitimate transactions could be deducted. In *James*, the deductions allowed involved payments made to outside parties. 899 F.2d at 910. That is a far cry from the situation in this case, where the Jacksons seek to deduct the very funds that enabled their participation in the distribution scheme. These payments were made to insiders and were without economic substance; that real money changed hands does not, without more, create substance.

Finally, the Jacksons claim that alternative grounds exist for allowing their claimed deductions. *See* Brief of Appellants at 23–25. Alternative grounds cannot support the claimed deduction because the sham nature of the transaction prevents it from being recognized for tax purposes. *See James*, 899 F.2d at 908. Because we affirm the conclusion of the Tax Court, we need not consider other potential grounds for the deduction. The action of the Commissioner affirmed by the Tax Court was proper.

AFFIRMED.