RAYMOND E. DAOUST AND BARBARA A. DAOUST, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Daoust v. Commissioner
Docket No. 1060-89
United States Tax Court
T.C. Memo 1994-203; 1994 Tax Ct. Memo LEXIS 201; 67 T.C.M. (CCH) 2914; May 5, 1994, Filed *201 Decision will be entered under Rule 155. Raymond E. Daoust, pro se. For respondent: Marikay Lee-Martinez. PATE
PATE
MEMORANDUM FINDINGS OF FACT AND OPINION PATE, Special Trial Judge: This case was assigned pursuant to the provisions of section 7443A(b)(3) and Rules 180, 181, and 182. [1]
Respondent determined deficiencies in and additions to petitioners' Federal income taxes as follows: Additions to Tax - section
Year
Deficiency
[1] 6653(a)(1)
6659
6661
1980
$ 2,160
$ 108  $ 648  $ 113
1983
7,768
[2] 388
2,195
- 1984
3,989
[2] 199
1,197
- 1985
1,149
[2] 57
345
- Respondent also determined that petitioners were liable for increased interest *202 under section 6621(c) for all years in issue. All of the determinations made by respondent resulted from the disallowance of Schedule F losses and an investment tax credit claimed by petitioners in connection with their investment in the "Agbanc Donor Cow program" (hereinafter the Agbanc program). With regard to all of the years in issue, petitioners have conceded liability for the deficiencies in tax, and respondent has conceded the section 6659 additions to tax. Because respondent conceded the section 6659 additions, the coordination provisions of section 6661(b)(3) do not apply. Respondent therefore asks that the addition to tax under section 6661 be correspondingly increased. The issues remaining for our decision are: (1) Whether petitioners may deduct costs of purchasing calves and embryos as an investment loss, a theft loss, a bad debt, or as an expense incurred for the production of income; (2) whether petitioners are liable for the additions to tax for negligence; (3) whether petitioners are liable for the additions to tax for a substantial understatement of income tax; and (4) whether petitioners are liable for additional interest due to substantial underpayments attributable *203 to a tax motivated transaction. FINDINGS OF FACT Some of the facts have been stipulated, and they are so found. Petitioners resided in Scottsdale, Arizona, when they filed their petition. Petitioners timely filed a joint income tax return for each year in issue. The Agbanc program was promoted by John McDonnell through two corporations, Ambanc, Ltd., and Agbanc. As part of the program, a ranch in Montana, Therriault Creek Ranch (hereinafter TCR), purchased Simmental cows for approximately $ 2,500 to $ 5,000 each. Agbanc then purchased the cows from TCR for $ 67,000 each, on terms requiring a cash downpayment of $ 5,700 and a note for $ 61,300 plus interest of 9.6 percent per annum. In turn, Agbanc resold the cows to individuals for $ 69,000 each, requiring a cash downpayment of $ 6,900, with the balance of $ 62,100 due pursuant to a nonsecured full recourse promissory note bearing interest at the rate of 9.93 percent per annum. The individuals then leased the cows back to TCR; the lease payments largely offset the payments on the note. Individuals would purportedly profit from the sales of the embryos and calves produced by TCR's embryo transfer program. [2]
*204 In Rasmussen v. Commissioner, T.C. Memo. 1992-212, we held that the Agbanc program lacked economic substance and a business purpose, and therefore, should be disregarded for tax purposes. [3] We considered the following factors to be of primary importance in reaching that conclusion: (1) Agbanc completely controlled the structure of the program; (2) the taxpayers had no opportunity to negotiate the price or terms of any of the elements; (3) the taxpayers knew practically nothing about breeding cattle and did little to enlighten themselves on the subject prior to entering into the program; (4) the cows purportedly were sold to the taxpayers at prices 25 times their cost; (5) the cows were leased for an annual rental almost six times their value; (6) the cows were "paid" for with promissory notes the taxpayers never expected would be collected; and (7) after investing their dollars, the taxpayers evidenced little interest in the profitability of their cows. *205 During the years in issue, Raymond E. Daoust (hereinafter petitioner) worked as an actuary. He holds a bachelor of science degree in economics. Mrs. Daoust received a bachelor of arts in psychology and was a housewife. Although petitioner's familiarity with the cattle industry is limited, his family has some history in farming. In the early 1900s, his grandfather owned and operated a very successful dairy farm in Iowa. As a teenager, petitioner spent summers helping out on his aunt's farm in South Dakota. In addition, one of petitioner's clients was the Michigan Animal Breeders and, while working for them, he observed the process of artificial insemination. During 1983, petitioner learned about the Agbanc program through an acquaintance, Wallace Butterworth (hereinafter Butterworth). Butterworth is an experienced investment adviser who was in the business of evaluating risk factors and potential economic benefits of various investments for both individuals and corporations. He holds an insurance license, an Arizona securities license, a Federal securities license, and a real estate license. Butterworth met McDonnell about 18 months before he offered the Agbanc program for *206 sale. McDonnell asked Butterworth to professionally evaluate the Agbanc program, but he declined to do so because he lacked knowledge of the cattle industry. Instead, Butterworth investigated McDonnell's business reputation. In this regard, he spoke with McDonnell's former business associates and several people in the investment industry. Specifically, he learned that McDonnell recently had promoted an airline leasing program that had apparently worked out well. After his investigation, Butterworth concluded that McDonnell was of good character and trustworthy. He viewed McDonnell as an affable, professional, and capable individual who promoted profitable investments. In fact, Butterworth referred several of his clients to McDonnell because he felt the Agbanc program had a potential for profit. Although Butterworth was entitled to renumeration for such referrals, he never accepted any compensation from McDonnell because he felt that he had not checked the program thoroughly. Petitioner consulted Butterworth, who conveyed the results of his investigation to him. Petitioner also carefully reviewed the 1983 Agbanc Individual Animal Offering (hereinafter the offering memorandum) *207 and discussed the program with McDonnell on several occasions. In the course of these meetings, petitioner met with two members of McDonnell's staff, whom he believed were experts in the cattle industry. Petitioner also discussed the Agbanc program with William D. Meyers (hereinafter Meyers), another individual with an extensive background in investments. Meyers had worked from 1967 until 1983 for the brokerage firm Merrill Lynch. [4] He has taught several courses on investments and is a member of myriad investment-type associations. Meyers advised petitioner that he was acquainted with McDonnell through the Association of Business Executives and, in his view, McDonnell was well respected in the Phoenix business community. Meyers also *208 testified as an expert witness on petitioner's behalf at trial. During his experience of selling tax-advantaged investments, Meyers never hired an independent person to conduct an examination of the investment, does not recommend that his clients do so, nor does he recommend that they physically view their investments. However, he usually recommends that his clients seek the advice of an accountant or tax attorney to review the tax aspects of a particular investment. Petitioner also asked his brother, Gregory A. Daoust, who is a certified public accountant (hereinafter Daoust or certified public accountant), to review the offering memorandum. During 1983, Daoust worked in the tax department of Price Waterhouse, a national accounting firm. In the course of his duties, he spent a significant amount of his time reading offering memorandums and making profit projections. After reading the offering memorandum, Daoust cautioned petitioner that McDonnell lacked experience in the cattle industry. However, he also pointed out that others involved with the program (specifically Rick Vredenburg of TCR) possessed the necessary expertise, and that a good cattleman (Vredenburg) and a good *209 businessman (McDonnell) made a good combination for formulating and promoting the Agbanc program. Daoust also advised petitioner to view his cow to ascertain its approximate value. Ultimately, petitioner decided against physically viewing his cow because of the considerable expense of traveling to Montana and, inasmuch as he was not a cattle expert, the relatively small benefit he would have gained thereby. Daoust and petitioner evaluated the Agbanc program's profit potential. In addition to critiquing the projections included in the offering memorandum, they ran a number of alternative projections based on varying residual values for his cow. After analyzing the various projections, they concluded that a profit could possibly be realized in the long run. Daoust also evaluated the tax benefits detailed in the offering memorandum. He advised petitioner that the Internal Revenue Service might challenge the amount of the investment tax credit, but the other deductions would be allowed as claimed. He explained to petitioner that he was cautious with regard to the investment tax credit because the amount of that credit could be challenged by the Internal Revenue Service on the *210 ground that petitioner's purchase price did not reflect the fair market value of his cow. Nevertheless, he felt that any amount of basis disallowed for investment tax credit purposes would be reclassified as deductible professional or management fees. Moreover, he advised petitioner that he would likely prevail if he took his case to court. After consulting with his advisors, petitioner purchased a cow in the Agbanc program. Moreover, he invested (in addition to the cash required by the Agbanc program) $ 3,750 and $ 8,540 during 1984 and 1985, respectively, to purchase embryos and calves from Agbanc (hereinafter additional costs). Daoust prepared petitioners' 1983, 1984, and 1985 joint Federal income tax returns. On those returns, petitioners deducted losses sustained in connection with the Agbanc program of $ 12,085, $ 12,522, $ 13,119, respectively. They also claimed an investment tax credit of $ 6,900 for 1983, $ 2,160 of which they carried back to 1980. Further, pursuant to Daoust's advice, petitioners attached the following statement to their 1983 income tax return: Section 6661 Disclosure The taxpayer purchased a cow in December of 1983 for $ 69,000. He entered into *211 a management agreement with a cattle breeding operation to breed the cow. With respect to the cow he has claimed an ACRS allowance under section 168 of $ 9,833 and claimed an investment tax credit of $ 6,900 under I.R.C. section 38.
Daoust urged petitioners to include the section 6661 disclosure statement on their income tax return even though it was likely to trigger an audit by the Internal Revenue Service. In the notice of deficiency, respondent determined that petitioners could not deduct their Agbanc losses or claim the investment tax credit and, therefore, were liable for deficiencies in their income taxes for 1980, 1983, 1984, and 1985. In addition, respondent determined that petitioners were liable for various additions to tax. OPINION Investment Loss
In Rasmussen v. Commissioner, T.C. Memo. 1992-212, we held that the Agbanc program lacked economic substance and therefore its participants were not entitled to the deductions and investment tax credit generated thereby. However, petitioners contend that they are entitled to deduct their cash outlays to participate in the Agbanc program as: (1) A loss sustained on an investment; *212 (2) a theft loss; (3) a bad debt; or (4) management or maintenance expenses of property held for the production of income. Moreover, petitioners argue that they are entitled to deduct their additional costs under section 165(c)(1) and (2) because they possessed a profit objective when they purchased their calves and embryos. However, petitioners have failed to show us any reason why we should treat the additional costs they expended to purchase the calves and embryos any differently from those they incurred to purchase and maintain their cow. In fact, petitioners relinquished all rights to their cow, calves, and embryos when they failed to continue their annual payments under the Agbanc program because they understood that all of these animals were under the control of TCR which would retain them as long as the note given for the purchase of the cow remained unpaid. Since petitioners did not explain why the tax treatment of the calves and the embryos should be treated differently from those expended to purchase their cow, we find that these additional costs were part of the Agbanc program and should be treated in the same manner as other cash outlays of the program. In general, *213 section 165(a) allows a deduction for losses sustained during the taxable year. In the case of an individual, a loss is deductible only if it is incurred in a trade or business, in a transaction entered into for profit, or as a result of a casualty or theft. Sec. 165(c). Even though we held in Rasmussen v. Commissioner, T.C. Memo. 1992-212, that the Agbanc program had no economic substance or business purpose, petitioners argue that they are entitled to deduct their cash outlays under section 165(a) and (c) because they had a profit objective when they entered into the Agbanc program. In Cherin v. Commissioner, 89 T.C. 986, 993-994 (1987), we held that the presence of a profit motive does not require the recognition for tax purposes of a transaction which lacks economic substance, reasoning that: The economic substance of a business transaction and the intent, purpose, or motive of an individual investor, while sometimes equated, are not identical. A business transaction by its very nature must have economic substance, that is, a realistic potential for profit * * *. Subjective intent cannot supply economic *214 substance to a business transaction.
Based on this reasoning, we have consistently held that, even if a taxpayer invests with the objective of making a profit, any loss sustained on that investment will not be recognized for tax purposes if the overall transaction lacks economic substance. Omerza v. Commissioner, T.C. Memo. 1992-206, affd. without published opinion 999 F.2d 540 (6th Cir. 1993); Illes v. Commissioner, T.C. Memo. 1991-449, affd. per curiam 982 F.2d 163 (6th Cir. 1992); Jackson v. Commissioner, T.C. Memo. 1991-250, affd. 966 F.2d 598 (10th Cir. 1992); see also Shriver v. Commissioner, 899 F.2d 724 (8th Cir. 1990), affg. T.C. Memo. 1987-627; Mahoney v. Commissioner, 808 F.2d 1219 (6th Cir. 1987), affg. Forseth v. Commissioner, 85 T.C. 127 (1985). Consequently, even assuming that petitioners had the requisite profit objective, their losses are not deductible because the Agbanc *215 program lacked economic substance. Omerza v. Commissioner, supra.We apply this reasoning both to sustain respondent's disallowance of petitioners' expenses required to enter and stay in the Agbanc program as well as her disallowance of petitioners' additional costs of purchasing embryos and calves. Further, for a loss to be deductible under section 165(a) and (c), the taxpayer must show that it was sustained during the taxable year. Even if we assume that the Agbanc program constituted a bona-fide business transaction, petitioners have not shown that their loss was sustained during any of the taxable years which are currently before us; namely 1980, 1983, 1984, and 1985. Rather, it appears that petitioner did not view his investment as lost when he made his 1985 payments to Agbanc. Inasmuch as petitioners do not even claim that their investment loss was sustained during any of the years we have before us, they cannot deduct the amount they paid Agbanc as an investment loss during those years. Secondly, petitioners contend that they are entitled to a theft loss under section 165(c)(3). That section provides a deduction for losses of property *216 due to theft. Theft is defined as larceny, embezzlement, or robbery. Sec. 1.165-8(d), Income Tax Regs. Theft losses are not deductible until the year of discovery. Sec. 165(e); sec. 1.165-8(a)(2), Income Tax Regs.
Petitioners have essentially conceded that they are not entitled to a theft loss. At trial, petitioner admitted that he did not believe that he had been defrauded by the promoters of the Agbanc program and felt that it collapsed due to poor market conditions and business judgment. Further, on brief, he conceded that he "does not believe he was robbed in the classic sense of the word". Because petitioners have not established that they sustained a theft loss during the years in issue, we hold that they are not entitled to a theft loss deduction. Next, petitioners contend that they are entitled to a deduction for a bad debt under section 166. That section allows a deduction for debts which become worthless during the taxable year. However, a bad debt deduction is allowable only if the taxpayer shows that a genuine debt existed. Andrew v. Commissioner, 54 T.C. 239, 244-245 (1970); Estate of Van Anda v. Commissioner, 12 T.C. 1158, 1162 (1949), *217 affd. per curiam 192 F.2d 391 (2d Cir. 1951); sec. 1.166-1(c), Income Tax Regs. The debt must be valid and enforceable and have actual value when it was acquired. Putnam v. Commissioner, 352 U.S. 82 (1956); Eckert v. Burnet, 283 U.S. 140 (1931); see sec. 1.166-1(c), Income Tax Regs. The taxpayer must show a real expectation of repayment at the time the loan was made. Arrigoni v. Commissioner, 73 T.C. 792, 799 (1980); Andrew v. Commissioner, supra at 245. There is no evidence in this record that petitioners ever loaned or advanced funds to Agbanc. Therefore, we cannot find that any debtor-creditor relationship ever existed between Agbanc and petitioners. Moreover, petitioners do not even allege that Agbanc had an obligation to repay their investment. Accordingly, petitioners are not entitled to a bad debt deduction. Petitioners also contend that they are entitled to deduct their additional costs under section 212. Section 212(2) allows a taxpayer to deduct "ordinary and necessary expenses paid or incurred during the taxable *218 year * * * for the management, conservation, or maintenance of property held for the production of income". However, as stated earlier, our holding in Rasmussen v. Commissioner, T.C. Memo. 1992-212, requires a finding that these embryos and calves were not "held for the production of income" because the Agbanc program lacked economic substance and a business purpose. Therefore, petitioners' additional costs are not deductible. Moreover, if we assume that the calves and embryos petitioners purchased (in addition to the cow acquired under the Agbanc Program) would produce income, we note that these additional costs were expended to purchase assets. Section 212(2) does not allow a deduction for the cost of purchasing assets (i.e., capital expenditures). Rather, it allows a deduction for the costs of managing or maintaining assets held for the production of income. Sec. 1.212-1(n), Income Tax Regs. Accordingly, we hold that petitioners may not deduct, under section 212, the additional costs they paid during the years in issue. Finally, petitioners argue that, even if the Court finds that their additional costs cannot be deducted during the years *219 in issue, we should allow them to deduct such costs in 1986 by application of the mitigation provisions. Secs. 1311-1314. They argue that these costs should properly offset the income they received from TCR in 1986 and reported on their income tax return for that year. However, because 1986 is not before us in this case, we lack jurisdiction to redetermine petitioners' income tax liability for that year. Sec. 6214(b); Patronik-Holder v. Commissioner, 100 T.C. 374, 377 (1993). Consequently, we do not express any opinion as to whether petitioners' additional costs may be deducted in 1986. Negligence
In the notice of deficiency, respondent also determined that petitioners were liable for additions to tax for negligence. In general, if any portion of an underpayment of tax is due to the taxpayer's negligence or intentional disregard of rules or regulations, 5 percent of the underpayment is added to the tax. Sec. 6653(a)(1). In addition, 50 percent of the interest on the portion of the underpayment attributable to the taxpayer's negligence may also be added to the tax. Sec. 6653(a)(2). Negligence has been defined as the lack of due care or *220 failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Zmuda v. Commissioner, 731 F.2d 1417, 1422 (9th Cir. 1984), affg. 79 T.C. 714 (1982). Petitioners bear the burden of proving that respondent's determination of addition to tax under section 6653(a) was erroneous. Betson v. Commissioner, 802 F.2d 365, 372 (9th Cir. 1986), affg. in part and revg. in part T.C. Memo. 1984-264; Bixby v. Commissioner, 58 T.C. 757, 791-792 (1972). There were three taxpayers and their spouses before this Court in Rasmussen v. Commissioner, supra. They all claimed the investment tax credit and losses from the Agbanc program on their respective income tax returns. We held that all three of them were subject to the additions to tax for negligence because: (1) Each of them relied solely on the representations made in the offering memorandum and by persons having a financial connection with Agbanc; (2) none of them had any expertise in the cattle business, yet they all failed to consult *221 with an independent person to evaluate the validity of Agbanc's factual representations; (3) none of them attempted to check with knowledgeable sources outside the Agbanc circle to independently verify the history, expertise, experience, credibility, reputation, or financial capability of Agbanc, TCR, or any of the other principals; and (4) they all signed documents which they knew, at the time, misstated the facts. Petitioners argue that they acted differently from the petitioners in Rasmussen in that they relied on the professional evaluation and advice of their independent investment advisers and certified public accountant when they claimed the investment tax credit and losses attributable to the Agbanc program on their income tax returns. They claim that this reliance shows that they were not negligent. Generally, reliance upon professional advice, standing alone, is not an absolute defense to negligence, but rather a factor to be considered in evaluating whether taxpayers were negligent. The taxpayer must establish that the reliance was reasonable. Freytag v. Commissioner, 89 T.C. 849, 888-889 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), *222 affd. on another issue 501 U.S. 868 (1991). Courts have absolved taxpayers from additions to tax for negligence in cases where the taxpayer: (1) Consulted a fully qualified, independent accountant; (2) fully disclosed the facts to him; and (3) then relied on his advice in good faith; see, e.g., Betson v. Commissioner, supra;Leonhart v. Commission, 414 F.2d 749 (4th Cir. 1969), affg. per curiam T.C. Memo. 1968-98; see also United States v. Boyle, 469 U.S. 241, 251 (1985). We agree with petitioners that prior to claiming the tax deductions and investment tax credit attributable to the Agbanc program, their actions differed from the taxpayers in Rasmussen v. Commissioner, supra. Petitioner did not rely solely on the information contained in the offering memorandum or solely on representations of persons having a financial connection with Agbanc. Rather, he sought out and relied upon information and recommendations from two qualified independent investment advisers and an independent certified public accountant, *223 all of whom were well experienced in analyzing offering memorandums. The accountant ran several projections varying the factual assumptions made in the offering memorandum, to determine the profit potential of the program, and then discussed his results with other accountants in his office. The accountant also evaluated the tax benefits proffered in the offering memorandum and advised petitioner that, although the Internal Revenue Service probably would challenge the investment tax credit, ultimately petitioner would prevail. We find that petitioner acted reasonably in relying on such advice. Accordingly, we hold that petitioners are not liable for the additions to tax for negligence. Substantial Understatement
Section 6661 provides that a taxpayer whose income tax return contains a substantial understatement of tax may be liable for an addition to tax equal to 25 percent of the underpayment attributable to such understatement. Pallottini v. Commissioner, 90 T.C. 498 (1988). An understatement is substantial if it exceeds the greater of 10 percent of the tax required to be shown on the return or $ 5,000. If a "substantial understatement" *224 is present, it triggers the application of the addition to tax provided for in section 6661(a). Woods v. Commissioner, 91 T.C. 88, 95 (1988). However, the Internal Revenue Service may waive all or part of this addition to tax if there was reasonable cause for the understatement and the taxpayer acted in good faith. Sec. 6661(c). The most important factor in determining reasonable cause and good faith is "the extent of the taxpayer's effort to assess [his] proper tax liability under the law." Sec. 1.6661-6(b), Income Tax Regs.
In Vorsheck v. Commissioner, 933 F.2d 757 (9th Cir. 1991), affg. in part and revg. in part an Oral Opinion of this Court, the Court of Appeals for the Ninth Circuit equated the "ordinary prudent person" test of section 6653 with the "reasonable" and "in good faith" test under section 6661. We previously had held that the taxpayers were not liable for additions to tax for negligence since they had relied in good faith on the advice of an accountant, but since there was a substantial understatement of income tax, they were liable for the addition to tax under section 6661. The Court of Appeals *225 for the Ninth Circuit reversed on the section 6661 issue, on the grounds that: If the Vorshecks were acting as "an ordinary prudent person in the circumstances," then their reliance upon the investment advice of their accountant was "reasonable" and "in good faith under all the circumstances." * * * Thus, the Vorshecks meet the standard for waiver of the penalty under section 6661. [Id. at 759; citations omitted.]
We see no distinction in the instant case and the case of Vorsheck v. Commissioner, supra. Because petitioner's reliance on the advice he received from his certified public accountant was reasonable and petitioners acted in good faith in reporting their tax liability, we hold that they are not liable for the additions to tax under section 6661. Vorsheck v. Commissioner, supra;Erhard v. Commissioner, T.C. Memo. 1992-376. Increased Interest
Respondent also determined that petitioners are liable for increased interest on substantial underpayments attributable to a tax motivated transaction. Section 6621(c) provides for an increased interest *226 rate with respect to any "substantial underpayment" (greater than $ 1,000) in any taxable year attributable to a tax motivated transaction. The increased rate applies to interest accrued after December 31, 1984, even though the transaction was entered into prior to the date section 6621(c) was enacted. Solowiejczyk v. Commissioner, 85 T.C. 552, 556 (1985), affd. per curiam without published opinion 795 F.2d 1005 (2d Cir. 1986). The term "tax-motivated transaction" includes any "sham or fraudulent transaction". Sec. 6621(c)(3)(A)(v). In Rasmussen v. Commissioner, T.C. Memo. 1992-212, we held that the Agbanc program lacked economic substance and a business purpose and, therefore, constituted a "sham" transaction for purposes of section 6621(c). McCrary v. Commissioner, 92 T.C. 827, 857 (1989). Because petitioners have failed to distinguish their Agbanc transactions from those in Rasmussen, we hold that their Agbanc transactions were also "sham" transactions under section 6621(c). It necessarily follows that petitioners are liable for the increased rate *227 of interest under section 6621(c). Patin v. Commissioner, 88 T.C. 1086, 1128-1129 (1987), affd. without published opinion sub nom. Hatheway v. Commissioner, 856 F.2d 186 (4th Cir. 1988), affd. sub nom. Skeen v. Commissioner, 864 F.2d 93 (9th Cir. 1989), affd. without published opinion 865 F.2d 1264 (5th Cir. 1989), affd. sub nom. Gomberg v. Commissioner, 868 F.2d 865 (6th Cir. 1989). To reflect the foregoing, Decision will be entered under Rule 155. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue. All Rule references are to the Tax Court Rules of Practice and Procedure.↩
1. Section 6653(a)↩ for 1980.
2. Plus 50 percent of the interest on the underpayment attributable to negligence under section 6653(a)(2)↩.
2. For a more complete description of the Agbanc program, see Rasmussen v. Commissioner, T.C. Memo. 1992-212↩.
3. At trial, petitioners agreed that the Agbanc program lacked economic substance and therefore should be ignored for tax purposes. Nevertheless, on brief they continued to maintain that, because they intended to profit from the transaction, they are entitled to the deductions which gave rise to the tax deficiencies. However, petitioners have not presented any arguments showing that their transaction with Agbanc differed materially from those in the test case, Rasmussen v. Commissioner, supra↩.Accordingly, we refuse to revisit that issue.
4. Meyers later worked from 1983 through 1986 for Smith Barney as branch office manager, and from 1986 until 1989 as vice president of sales and marketing at Recorp of America servicing the institutional market. He currently works for Harris Trust Bank marketing employee benefits.↩