DARRELL A. WRIGHT AND PATRICIA S. WRIGHT, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Wright v. Commissioner
Docket No. 24124-89
United States Tax Court
T.C. Memo 1994-288; 1994 Tax Ct. Memo LEXIS 293; 67 T.C.M. (CCH) 3125; June 23, 1994, Filed *293 Decision will be entered pursuant to Rule 155. For petitioners: William W. Reid and Carl E. Kohlweck. For respondent: Robin F. Kaufer. COHEN, BUCKLEY
COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: This case was assigned to Special Trial Judge Helen A. Buckley pursuant to section 7443A(b)(4) and Rules 180, 181, and 183. [1] The Court agrees with and adopts the opinion of the Special Trial Judge which is set forth below. OPINION OF THE SPECIAL TRIAL JUDGE BUCKLEY, Special Trial Judge: Respondent determined a deficiency in petitioners' Federal income tax for taxable year 1982, together with additions to tax and additional interest, in the following amounts: Additions to Tax and Increased Interest Sec.
Sec.
Sec.
Sec.
Year
Deficiency
6653(a)(1)
6653(a)(2)
6661(a) 6621(c) 1982
$ 211,159.00
$ 10,557.95
[1]
$ 52,789.75
[2]
*294 Petitioners concede that they are not entitled to any partnership flow-through losses, deductions, or credits claimed with respect to their interest in Far West Drilling Associates for taxable year 1982, and that they are liable for increased interest with respect to the resulting deficiency pursuant to section 6621(c). The issues remaining for decision, [2] all of which relate to their investment in Far West Drilling Associates, are: (1) Whether petitioners are liable for the additions to tax for negligence under section 6653(a)(1) and (2), (2) whether petitioners are liable for the addition to tax for a substantial understatement pursuant to section 6661, and (3) whether petitioners are entitled to a net operating loss carryback from 1985, due to the purported worthlessness of their investment in Far West Drilling Associates. FINDINGS *295 OF FACT Some of the facts have been stipulated, and they are so found. The stipulation of facts and attached exhibits are incorporated herein by reference. At the time the petition herein was filed, petitioners resided in Pasadena, California. Petitioner Darrell A. Wright (hereinafter petitioner) has a B.S. degree in civil engineering from the University of Southern California and has been employed by a variety of real estate development businesses for his entire business career. For over 20 years petitioner worked in his family's construction business, run by his father, in which he rarely, if ever, had any responsibility for making financial management decisions. Petitioner's father kept petitioner active in only the technical aspects of the construction business and did not allow petitioner to become involved with financial considerations. In the early 1970's, petitioner stopped working for his father and began working for several different construction businesses during the next 7 years, but his responsibilities at each job were roughly the same as they had always been -- supervising the field site. Although petitioner was sometimes asked to read and understand contracts *296 or hire outside experts for construction contracts, he remained insulated from financial aspects of the industry. In all years prior to 1981, petitioners were moderate income taxpayers whose only investment experience consisted of maintaining ordinary bank accounts containing little in savings. While working for his father, petitioner never earned more than $ 10,000 per year, and while working for others he never earned more than $ 35,000 in years prior to 1981. Petitioner Patricia S. Wright, who never completed college, was sometimes employed in a clerical capacity during these years in order to make ends meet. Prior to 1981, the most petitioners earned in a year was about $ 46,000. In 1978, as petitioner's father was dying and the family needed to liquidate certain real estate holdings of the family business, petitioner helped arrange the sale of the real estate held by the family corporations to W & A Builders, a division of Watt Industries. Part of the agreement between the family corporations and W & A provided for petitioner to become employed by W & A in a superintendent position, whereby petitioner would be entitled to a participation interest in W & A's profits from *297 the land. As a result of these transactions, petitioners in 1981 received more than $ 621,000 in participation payments. Petitioner also received a salary of $ 36,000 and certain allowances. Petitioners for the first time in their lives now possessed a significant sum of money. Nothing in their respective experiences gave petitioners any idea about how to manage their sudden wealth, and they were convinced they needed professional advice to help them. Petitioners first went to Merrill Lynch, where they deposited $ 621,000 into a cash management account. Petitioners were not interested in investing in either stocks or bonds, as they knew they had no understanding about those markets. Eventually one of Merrill Lynch's account representatives referred petitioners to Al Davino, a certified financial planner (CFP) for advice. Petitioners met with Davino who impressed them greatly with his knowledge of financial matters and other topics. Davino convinced petitioners that he was the appropriate person to look out for their financial interests. Petitioners came to rely heavily upon Davino's financial advice after meeting with him on at least three occasions, listening to his presentations *298 and representations, reading certain articles offered by Davino, and spending time with him socially. Petitioners were advised that Davino had a degree in physics and was qualified as a certified financial planner. Petitioners read an article from a Los Angeles financial periodical, provided by Davino, which concerned certified financial planners in general and quoted Davino in particular. The article and Davino himself described the role of a CFP to be a provider of certain services normally provided by a variety of professionals, including lawyers, insurance agents, accountants, investment counselors, and estate planners. Petitioners learned that Davino was president of the local chapter of the International Association of Financial Planners and was chairman of the Ethics Committee of one of the professional associations of CFP's. Davino also told petitioners that he lectured and conducted seminars concerning financial planning for lawyers, accountants, and other professionals. It was clear to petitioners, after being referred to Davino by an employee of Merrill Lynch and after reading the article, that they were dealing with a prominent member of the Los Angeles area business *299 community. Davino prepared charts to make the information he presented digestible, and he appeared to have done extensive research and offered complete information on the investments which he promoted. After petitioners rejected some suggestions, Davino prepared others. Davino told petitioners that he developed an overall investment and estate plan for petitioners which was specially tailored to suit their needs. The plan included a $ 3 million life insurance policy and a variety of investments designed as part of one overall comprehensive plan. Davino explained that some of the investments were designed in the short term to lower petitioners' tax burden, but the overall strategy was to increase petitioners' net worth by several million dollars over the next 10 years and preserve a substantial portion of their estate for their offspring. Davino also explained to petitioners that each part of the investment plan served a purpose and was crucial to the integrity of the whole. Part of Davino's strategy for petitioners was to insure that their children would have sufficient liquid assets to pay estate taxes on their estate, an amount he variously estimated to be $ 4 to $ 10 million. *300 Accordingly, petitioner husband purchased $ 3 million of life insurance coverage as suggested by Davino and his partner, at a cost of $ 40,000 per year. The financial plan proposed by Davino was forwarded to the insurer to justify the substantial amount of coverage requested by petitioner. Petitioners paid Davino $ 2,000 for his advice. They also knew that Davino earned commissions on the investments that he sold, but they did not see this as a reason to view Davino's advice with suspicion. Petitioner did not believe that one investment idea would be preferred over another in Davino's mind because of his receipt of commissions. One of the investments which Davino recommended to petitioners was Far West Drilling Associates (FWDA), a limited partnership formed in Utah on December 4, 1980. According to its May 11, 1981, offering memorandum, FWDA was to engage in (1) a developmental drilling program, (2) an exploratory drilling program, and (3) the acquisition of a license to use, sell, or lease a new drilling product currently being developed, the Terra Drill. The partnership planned to offer 220 units at $ 157,500 per unit, with each investor obligated to pay $ 15,000 on each *301 subscription and the balance evidenced by three 8-percent promissory notes, one in the amount of $ 15,000 payable on March 1, 1982, the second in the amount of $ 15,000 payable on March 1, 1983, and the third payable on January 15, 1994, with a balloon payment of $ 112,500. The offering memorandum set forth the anticipated tax losses to be incurred by each unit invested during the first 3 years as follows: Cash
Estimated
Loss as a percent
Year
investment
tax loss
of cash invested
1981
$ 15,000
($  52,500)
350%
1982
15,000
(52,500)
350%
1983
15,000
(52,500)
350%
Total
$ 45,000
($ 157,500)
Petitioners subscribed to five units. FWDA is one of six limited partnerships which comprise the Petro-Tech National Litigating Project. This Court has already found that FWDA was a tax shelter organized to avoid Federal income tax. Webb v. Commissioner, T.C. Memo. 1990-556, remanded on another issue 17 F.3d 398 (9th Cir. 1994). In Webb, we concluded that each partnership involved in the case was not engaged in an activity with an honest objective of making a profit within the meaning of section 183, and the *302 transactions lacked economic substance. Petitioners relied heavily on Davino's recommendation that they invest in FWDA, but this reliance was based on certain criteria. Petitioners reviewed the documentation concerning FWDA provided by Davino, which included the offering memorandum, with the attached expert opinions and representations. Although petitioners had no special knowledge of the oil and gas industry, they believed that they read enough and heard enough from Davino about the project that they understood the general activities of FWDA and their obligations. Petitioners knew that Davino also had no specialized knowledge of oil and gas, but he appeared to be knowledgeable and competent enough so that they could trust his recommendations. Petitioners' trust in the project was further solidified by other factors. The offering memorandum included, to the best of their means of understanding, representations by a New York law firm and a national accounting firm that they were willing to support the merits of this investment. In addition, Davino presented petitioners with color photographs which were reputed to represent a full-scale prototype of the Terra Drill to be used *303 by FWDA. Davino also led petitioners to believe that the drill was not only feasible and had been successfully tested, but that the drill bit was in commercial production, and that Standard Oil and General Dynamics were already using the drill under a letter of intent. Davino also provided petitioners with an article about the strong potential for oil drilling success in Ohio, one of the states in which FWDA was to drill. Davino showed petitioner an article that appeared in Drilling magazine which discussed the drill's potential to revolutionize drilling. These articles, in the minds of the inexperienced petitioners, served to further corroborate the representations which had been made by Davino. Davino also told petitioners that the drill had been tested at 2,500 feet below the ground and had performed favorably. Furthermore, Davino projected petitioners to earn substantial returns from their FWDA investment in the long term. Lastly, petitioners were advised by Davino that the Internal Revenue Service had already audited the partnership in 1980, and that the audit had resulted in no change. Petitioners agreed to allow Davino to implement his investment plan, of which FWDA *304 was only a part. On September 10, 1981, petitioner subscribed to purchase five limited partnership units in FWDA at $ 157,500 per unit. Petitioners invested cash in the partnership in the aggregate amount of $ 233,101.40 paid in installments on or about the following dates and in the following amounts, including $ 8,101.40 in interest: Date
Cash investment Sept. 10, 1981
$ 75,000.00
Mar. 15, 1982
$ 76,101.40
Mar. 15, 1983
$ 82,000.00
Petitioners eventually received a total of about $ 1,600 in distributions from the partnership. Petitioners monitored their investment in FWDA, reviewing periodic status reports of the partnership and financial reports from the accountants Laventhal & Horwath, before filing their 1982 tax return, which they had prepared by a certified public accountant. In later years, petitioners continued to monitor their investment in FWDA. In 1985, petitioners learned that a principal consultant to the partnership had misappropriated capital from the partnership, and that the partnership's liabilities far exceeded the value of its assets. The partnership's new financial auditors believed the partnership to be no longer viable in 1985. Petitioners' *305 investment in FWDA became worthless in 1985. OPINION Petitioners entered into the FWDA investment with the objective of making a profit. Petitioners argue that the additions for negligence and substantial understatement should not apply, since they reasonably relied on Davino in all matters relating to their investment in FWDA. Petitioners bear the burden of proving that respondent's determinations are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Negligence. Section 6653(a)(1) imposes an addition to tax if any portion of the underpayment is due to negligence or intentional disregard of the rules or regulations. Section 6653(a)(2) provides for an addition to tax in an amount equal to 50 percent of the interest due on the portion of the underpayment attributable to negligence. Negligence under section 6653(a) is the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Neely v. Commissioner, 85 T.C. 934, 947 (1985). Petitioners maintain that they exercised reasonable care in making their FWDA investment and claiming FWDA losses *306 on their 1982 tax return, since they reasonably relied on their certified financial planner regarding the financial merits of the FWDA investment and the propriety of the losses they claimed. Under the facts and circumstances of this case, we agree with petitioners. Under certain circumstances, good faith reliance by a taxpayer on the advice of a competent advisor may satisfy the reasonable and prudent person standard. See, e.g., Ewing v. Commissioner, 91 T.C. 396, 423-424 (1988), affd. without published opinion 940 F.2d 1534 (9th Cir. 1991). Although Davino did not know all there was to know about FWDA and had no special knowledge of the oil and gas industry, petitioners were unsophisticated investors with little or no experience at all in financial matters. Petitioners believed, however, that they were smart enough to recognize that Davino appeared to be competent, professional, and ethical. Petitioners paid attention to the facts as represented by Davino. He had been referred to them by Merrill Lynch, had appeared to have thought about their entire financial situation, and had given them not only theoretical advice *307 but also articles and documents which appeared to corroborate those representations. Petitioners were not specifically shopping for tax shelters; they sought Davino's expertise to prepare a long-term integrated retirement, estate planning, and investment package. Although petitioners understood that there were risks involved in the investment, they were not sophisticated enough to look beyond the surface and discover the latent dangers of the investment or the abusiveness of the tax shelter scheme. Although they understood that Davino sought to minimize their tax liabilities, petitioners did not realize that their claimed losses were improper. Furthermore, Davino convinced petitioners that FWDA was not only an important component of the overall financial plan, but that it could very well be an investment to pay large dividends in the future. Respondent argues that petitioners were not moderate income investors or unsophisticated investors, and that they were negligent in failing to do their own investigation into the bona fides of their investment. We disagree. While at the time of the actual investment petitioners were rather wealthy investors, this wealth was unprecedented *308 to them, and nothing in their lives had given them the experience they needed to manage their money. For their entire lives previous to the W & A distribution, petitioners had little money to save or reason to become involved with the financial world. Petitioners lacked the sophistication to recognize the importance or the meaning of the warning signs inherent in FWDA, and Davino was there to appease any concerns they may have had. Due care does not necessarily require investors of petitioners' inexperience and lack of financial sophistication to independently investigate their investments. Petitioners were novices, well out of their element, and they reasonably relied on their advisor in good faith. Petitioners made the effort to understand what they could and did not try to keep themselves ignorant of danger signs. If an investor is unsophisticated, reasonable care is exercised by reading and attempting to understand the investment, then relying on a competent advisor to explain the rest. Petitioners did not blindly take what Davino told on faith. Instead, they thought about the information which was available to them, considered it, and trusted Davino because they thought *309 it was prudent to do so. Petitioners have shown that they reasonably believed that Davino had sufficient knowledge of the facts to render competent advice to them. In addition, petitioners monitored their investment and continued to review status reports. Given petitioners' inexperience and lack of financial education, the fact that Davino provided petitioners with many trappings of legitimacy of their investment, coupled with their monitoring of the investment, lead us to believe that petitioners exercised due care under the circumstances. We hold that petitioners are not liable for the addition to tax for negligence. Substantial Understatement. Section 6661(a) provides for an addition to tax if any part of an underpayment is attributable to a substantial understatement of income tax. Sec. 6661(a); Pallottini v. Commissioner, 90 T.C. 498 (1988). An understatement is substantial if it exceeds the greater of 10 percent of the correct tax or $ 5,000. Sec. 6661(b)(1)(A). Section 6661(c) provides that the Secretary may waive the penalty "on a showing by the taxpayer that there was reasonable cause for the understatement * * * and that the taxpayer *310 acted in good faith." We note that venue for appeal in this matter lies in the Ninth Circuit. That Circuit has held that reliance upon professional advice or other facts constitutes a showing of reasonable cause and good faith if, under all the circumstances, such reliance was reasonable and the taxpayer acted in good faith. Sec. 1.6661-6(b), Income Tax Regs. Where it was reasonable for the taxpayer to rely upon professional advice, and the taxpayer did so in good faith, then the Commissioner should waive the addition. Vorsheck v. Commissioner, 933 F.2d 757 (9th Cir. 1991). We have already found that petitioners were not negligent under the circumstances. Accordingly, we also find that their reliance upon Davino's investment advice was reasonable and in good faith. Thus, petitioners meet the standard of waiver of the section 6661 penalty. We are bound under Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971), to follow the holding in the Ninth Circuit on this issue. Vorsheck v. Commissioner, supra.We hold that petitioners are *311 not liable for the substantial understatement addition to tax. Net operating loss carryback. Petitioners argue that they are entitled to an ordinary loss deduction under section 165(c)(2) for the loss of their unrecovered out-of-pocket investment in the partnership. Section 165(c)(2) provides for the allowance of losses incurred in a transaction entered into for profit, though not connected to a trade or business. We have held that petitioners entered into the FWDA transaction with a bona fide profit objective. It is clear that petitioners hoped that the investment, and the entire plan devised by Davino, would yield a strong return for petitioners over the course of time. They even entered into estate planning that was centered upon the profit they hoped to earn. However, the FWDA partnership lacked economic substance. Webb v. Commissioner, T.C. Memo. 1990-556. We considered the same argument in Illes v. Commissioner, T.C. Memo. 1991-449, affd. per curiam 982 F.2d 163 (6th Cir. 1992): whether a section 165(c)(2) deduction would be allowed if the transaction lacked economic substance *312 but the taxpayer had a subjective profit motive. We stated in Illes that: Even if we were to assume that petitioner had a profit motive, petitioner could not prevail in this case because the transactions lacked economic substance. See Cherin v. Commissioner, 89 T.C. 986, 993-994 (1987), where we held that the presence of an individual's profit motive does not require the recognition for tax purposes of a transaction which lacks economic substance.
As we observed in Cherin v. Commissioner, 89 T.C. 986, 993-994 (1987): We have never held that the mere presence of an individual's profit objective will require us to recognize for tax purposes a transaction which lacks economic substance. The economic substance of a business transaction and the intent, purpose, or motive of an individual investor, while sometimes equated, are not identical. A business transaction by its very nature must have economic substance, that is, a realistic potential for profit * * * Subjective intent cannot supply economic substance to a business transaction. * * *
Based on the foregoing, we have consistently held that even if *313 a taxpayer invests with the subjective intent of making a profit, the investment will not be recognized for tax purposes if the overall transaction lacks economic substance and business purpose. Daoust v. Commissioner, T.C. Memo. 1994-203; Omerza v. Commissioner, T.C. Memo. 1992-113, affd. without published opinion 999 F.2d 540 (6th Cir. 1993); Jackson v. Commissioner, T.C. Memo. 1991-250, affd. 966 F.2d 598 (10th Cir. 1992); see also Shriver v. Commissioner, 899 F.2d 724 (8th Cir. 1990), affg. T.C. Memo. 1987-624; Mahoney v. Commissioner, 808 F.2d 1219 (6th Cir. 1987), affg. Forseth v. Commissioner, 85 T.C. 127 (1985). Accordingly, petitioners are not entitled to a net operating loss carryback. Decision will be entered pursuant to Rule 155. Footnotes
1. Unless otherwise indicated, section references are to the Internal Revenue Code in effect for the year at issue; Rule references are to the Tax Court Rules of Practice and Procedure.↩
1. 50 percent of the interest due on the deficiency.↩
2. The annual rate of interest under sec. 6621(c) is 120 percent of the interest payable under sec. 6601 with respect to any substantial underpayment attributable to a tax motivated transaction.↩
2. The parties entered into a Stipulation of Settled Issues regarding determined deficiencies resulting from investments in August Partners Ltd. and San Vicente Medical Partners.↩