TAKI N. ANAGNOSTON AND KATHLEEN ANAGNOSTON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Anagnoston v. Comm'r
Docket No. 24737-91 United States Tax Court
T.C. Memo 1994-334; 1994 Tax Ct. Memo LEXIS 368; 68 T.C.M. (CCH) 146; July 21, 1994, Filed *368 Decision will be entered under Rule 155. For petitioners, Dwight J.L. Epperson. For respondent, Emily J. Kingston. PARR
PARR
MEMORANDUM FINDINGS OF FACT AND OPINION PARR, Judge: Respondent determined deficiencies in and additions to petitioners' Federal income taxes as follows: Additions to Tax
Sec.
Sec.
Sec.
Year
Deficiency
6653(a)(1)
6653(a)(2)
6653(a)(1)(A)
1982
$ 35,327
$ 1,766.35
[1]
--
1983
$ 15,868
793.40
[1]
--
1984
$ 30,130
1,506.50
[1]
--
1985
$ 21,827
1,091.35
[1]
--
1986
$ 42,907
--
--
$ 2,145.35
Additions to Tax
Sec.
Sec.
Year
6653(a)(1)(B)
6661
1982
--
$ 8,831.75
1983
--
3,967.00
1984
--
7,532.50
1985
--
5,456.75
1986
[1]
10,726.75
The issues for decision are: (1) Whether petitioners' investment in sheep during the taxable years 1982 through 1986, had economic substance beyond the creation of tax benefits. We hold that it did not. (2) Whether the petitioners are entitled to an investment tax credit of $ 20,000 for the taxable year 1982. We hold *369 that they are not. (3) Whether petitioners are entitled to a general business credit carryback of $ 1,670 from the tax year 1986 to the tax year 1984. We hold that they are not. (4) Whether petitioners properly reported income received from the sale of sheep. We hold that they did not. (5) Whether petitioners failed to report proceeds received from a transfer of a 20-percent undivided interest in real property in the taxable year 1986. We hold that they did and further hold that petitioners are entitled to claim a cost basis in the property transferred. (6) Whether petitioners are liable for the additions to tax for negligence or disregard of the rules or regulations pursuant to section 6653(a)(1) and (2) [1] with respect to the tax years 1982, 1983, 1984, and 1985, and pursuant to section 6653(a)(1)(A) and (B) with respect to the tax year 1986. With respect to the taxable years 1982, 1983, 1984, and 1985, we hold that they are. With respect to the taxable year 1986, we hold they are not. (7) Whether petitioners are liable for the additions to tax for substantial understatement of their tax liabilities pursuant to section 6661 with respect to the taxable years 1982 through *370 1986. With respect to the taxable years 1982, 1983, 1984, and 1985, we hold that they are. With respect to the taxable year 1986, we hold they are not. (8) Whether petitioners' involvement in the sheep activity during the tax years 1982 through 1986 was a tax-motivated transaction. With respect to the taxable years 1982, 1983, 1984, and 1985, we hold that it was. With respect to the taxable year 1986, we hold that it was not. FINDINGS OF FACT Some of the facts have been stipulated, and they are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference. At the time the petition herein was filed, petitioners resided in Gilroy, California. Petitioners are married and timely filed joint Federal income tax returns for each year at issue. (References to petitioner in the singular *371 are to Taki N. Anagnoston). During the taxable years 1982 through 1986, petitioner Taki N. Anagnoston was a physician, specializing in obstetrics and gynecology. Petitioner Kathleen Anagnoston was a nurse who worked in her husband's medical office. Each petitioner received wages from the Taki N. Anagnoston Medical Corporation during the years in question. In early December 1982, petitioner was approached by one of his medical colleagues, Dr. Joseph Barbara, and was presented with a proposal to enter into a sheep investment program. Pursuant to the proposal, petitioner was to purchase from Dr. Barbara two units in The Barbara Family Farm Sheep Investment Program, each unit consisting of 20 "purebred registered Heggemeir Suffolk Sheep (Ewes) for $ 100,000 per unit at 10 percent interest for 5 years." Under the proposal, entitled "Sheep Investment Program," Dr. Barbara guaranteed the following: Guaranteed Income: For the term of the contract I guarantee to sell each year's lamb crop for a minimum of $ 25,000. * * * I receive 50% commission on sales amounts exceeding $ 25,000. * * *
The proposal further stated: Possible Income: If each of the original 20 ewes has *372 twins which is very possible and if on the average half of the lambs born are ewes then your 20 original ewes will produce 20 new ewes each year. (As the original ewes get older they are gradually replaced with new ewes so your original livestock investment will last indefinitely.) The 20 new ewes each year can be sold to other investors like yourself who are looking for excellent tax shelters with a very high income potential -- a very rare combination. This would then produce an income of $ 100,000 per year.
Dr. Barbara also agreed to provide board for all the sheep and their progeny until the date of sale or other disposition, at the cost of $ 1.00 per day for each ewe and $ .50 per day for each lamb, to be paid by petitioner to Dr. Barbara. As a part of the proposal presented to petitioner, Dr. Barbara attached projections as follows: POTENTIAL INCOME:
82 (Dec) $ 19,400 tax savings -- $ 10,600 cost
=
$ 8,800  83 $ 25,000 tax savings -- $ 19,800 cost
=
$ 5,300  84 Sell 1 unit
=
$ 100,000
85 Sell 2 units
=
$ 200,000
86 Sell 3 units
=
$ 300,000
87 Sell 4 units
=
$ 400,000
$ 1,014,100
Original unit + 5 new units remain
- these may be bred indefinitely for
an annual income of greater than
$ 500,000 or sold out at this point
for $ 600,000
$ 1,014,100
600,000
Each original unit could produce this
income after 5 years
$ 1,614,100
*373 Petitioner presented this proposal and prospectus to his accountant, Mr. Louis Boitano, for his views as to whether petitioner should involve himself in the program. By letter dated December 6, 1982, Mr. Boitano advised petitioner that: The amateur approach to the above proposal scares me the most. The first element of any income tax shelter plan must be an overall likelihood of a profit exclusive of the income tax consequences. If the plan holds no likelihood of a monetary gain exclusive of the tax savings, IRS can toss it out for lack of a profit motive.
After discussing various elements of the proposal in the body of the letter, Mr. Boitano closed by stating, "Stay in the real property and medical areas. You know those." In addition to seeking the advice of his accountant, petitioner also read some magazine articles provided to him by Dr. Barbara dealing with sheep investments and spoke to other physicians in his community who had also invested in the same type of investment programs. After receiving his accountant's advice, petitioner entered into two written contracts with Dr. Joseph Barbara on December 15, 1982, wherein he agreed to purchase a total of 40 purebred *374 sheep ewes (two units) for the total purchase price of $ 200,000 ($ 100,000 per unit of 20 ewes each), with payments to be made over a period of years including interest at 10 percent annually. Pursuant to each of the contracts, petitioner agreed to pay principal and interest to Dr. Barbara as follows: 2. Buyer agrees to pay principle [sic] and interest to seller according to the following schedule: December 15, 1982 -- $ 500 principle [sic] and no interest January 3, 1983 -- $ 9,500 principle [sic] and no interest Prior to December 15, 1983 -- no principle [sic] and $ 9,000 interest Prior to December 15, 1984 -- $ 20,000 principle [sic] and $ 9,000 interest Prior to December 15, 1985 -- $ 20,000 principle [sic] and $ 7,000 interest Prior to December 15, 1986 -- $ 20,000 principle [sic] and $ 5,000 interest Prior to December 15, 1987 -- $ 25,000 principle [sic] and $ 2,500 interest Any net gain derived from the sale of the aforementioned sheep or their progeny shall be applied toward the annual principle [sic] and interest payments and such payment shall be made immediately upon receipt of such gains by buyer. The buyer also has the option of paying more or all of the *375 remaining principle [sic] at any time on this contract.
In addition, pursuant to each of the contracts, petitioner's liability for the purchase price of the sheep was as follows: 3. Both buyer and seller agree that this note shall be secured solely by the aforementioned sheep, all of their progeny and any and all net gains and notes derived from their sale. [Emphasis added.]
Petitioner remained personally liable for all costs of caring for the sheep. Pursuant to a contemporaneously executed Broker's Maintenance and Option Contract, it was agreed that Dr. Barbara would act as petitioner's sole and exclusive agent for the sale of the sheep and their progeny for a period of 5 years, and would receive a commission for any such sales. The agreement provided in pertinent part: 1. Seller agrees that broker shall be his sole and exclusive agent for the sale of those Suffolk sheep and their progeny which seller acquired in December, 1982, * * *.
* * * The certificates of registry of the National Suffolk Sheep Association indicate that the owners and breeders of record of the original 40 head of sheep purchased by petitioners were various individuals other than *376 petitioners or Dr. Barbara. Petitioners never received the original certificates of registry evidencing their ownership of the sheep, nor was their name ever listed on the certificates as the owners of the sheep. In addition, charts prepared and maintained by Dr. Barbara showing the registration numbers of the original flock of sheep purchased by petitioner, as well as the disposition of those sheep, reflect duplications and inconsistencies. At least four of the sheep, #80-317, #80-2103, #80-1915, and #80-1758 appear on each of the charts maintained for unit #1 and unit #2, or as duplicates on the same chart. Further, the charts are inconsistent as to dispositions or deaths of the sheep or their progeny. Sheep listed as surviving through 1986 on one chart are listed as having died on the other chart. Progeny listed as surviving on one chart are listed as having died on the other chart. For example, sheep #80-1915 and #80-1758 appear on chart #2 twice. As to #80-1915, the first listing indicates the sheep survived through 1986, but the second listing on the same chart indicates the sheep died in 1985. Sheep #80-1758, also listed twice on chart #2, is reported in the first *377 listing as having a ram born to it in 1983, which died. The second listing reflects that the ram survived. On December 15, 1982 (the date petitioner entered into the contracts), petitioner paid Dr. Barbara $ 1,000, representing a payment of $ 500 toward the principal amount of each note for the purchase of the sheep. On December 30, 1982, petitioner paid Dr. Barbara $ 600 for boarding and feed costs for the two units. No sales of sheep occurred in 1982. On their Federal income tax return for 1982, petitioners claimed a farm loss on Schedule F of $ 30,600, made up of $ 600 for maintenance of breeding sheep, and $ 30,000 in depreciation of the sheep. In addition, petitioners claimed a $ 20,000 investment tax credit relating to the purchase of the sheep. During 1983, petitioner paid Dr. Barbara $ 19,000 for principal payments on the notes ($ 9,500 towards principal on each note), and $ 19,186 for the boarding and feeding of the sheep. No sales of sheep occurred in 1983. On their tax return for 1983, petitioners claimed a farm loss on Schedule F in the amount of $ 63,974 made up of $ 19,974 for maintenance of breeding sheep and $ 44,000 in depreciation of the sheep. On March *378 15, 1984, after particularly poor breeding and sales success, the 1982 contracts between petitioner and Dr. Barbara were modified and amended to change the payment terms and distribution of the sales proceeds. Pursuant to the Addendum to Contract of Sale, payments on the purchase obligation were to be for interest only in the amount of $ 9,000 per year, with a balloon payment of the remaining interest and principal on December 15, 1988. Petitioner's liability for the original purchase price and the boarding and commission fees remained secured in whole only by the sheep, their progeny, and any promissory notes from sheep sales. In accord with the amended contracts, on March 15, 1984, petitioner paid Dr. Barbara $ 4,500 in interest. Thereafter, pursuant to a contract of sale entered into between petitioner and Dr. Barbara on May 15, 1984, Dr. Barbara bought 20 of the progeny born to the sheep originally sold to petitioner, for the total purchase price of $ 100,000, $ 10,000 payable in cash and the remaining $ 90,000 to be paid over 5 years at 12.5 percent interest, such note to be offset against the outstanding principal balance owing from petitioner of $ 90,000 as to unit #1. *379 The contract of sale provided for payments as follows: The payments on the purchase obligation shall be interest only in the sum of $ 11,250.00 per year, payable quarterly, 1st payment to commence on August 15, 1984. On December 15, 1988, the interest payment plus the entire principle [sic] balance of $ 90,000 shall be due and payable. Any net gain derived from sale of the aforementioned sheep or their progeny shall be applied toward the annual principle [sic] and interest payments and such payment shall be made immediately upon receipt of such gains by buyer. The buyer also has the option of paying more or all of the remaining principle [sic] at any time on this contract.
On May 15, 1984, Dr. Barbara paid petitioner $ 1,550 as a finders fee for the sale of the sheep. Also, on May 15, 1984, petitioner paid Dr. Barbara $ 4,490 as commission for the sale of 20 sheep. In addition, on August 15, 1984, Dr. Barbara paid petitioner $ 10,000 representing a "down payment for purchase of 20 ewes." On August 3, 1984, petitioner paid Dr. Barbara $ 21,700 for the "sheep project." In addition, on December 31, 1984, pursuant to the amended contract, petitioner paid Dr. Barbara $ 11,250, *380 representing the yearly interest owing on the purchase contracts. On their return for 1984, petitioners claimed a farm loss of $ 72,390, made up of $ 4,200 in maintenance on breeding sheep, $ 4,490 as commission expense for the sale of sheep, $ 40,000 of interest expense, and $ 42,000 in depreciation on the sheep. Offset against these expenses was income received by petitioner of $ 10,000 for the sale of the sheep, a finder's fee of $ 1,550, and interest of $ 6,750. During the taxable year 1985, petitioner paid Dr. Barbara $ 11,250 in interest on the notes. No sales of sheep occurred during the taxable year 1985. On their tax return for the taxable year 1985, petitioners claimed a farm loss in the amount of $ 53,250, made up of the $ 11,250 interest payment and $ 42,000 in depreciation on the sheep. On December 26, 1986, petitioner entered into a contract of sale with Dr. Barbara pursuant to which petitioner agreed to transfer to Dr. Barbara all of his right, title, and interest in the sheep and progeny remaining in the flock and all notes receivable. The value placed on this transaction as agreed to by the parties was $ 60,000, with $ 40,000 of such amount representing the *381 fair market value of the remaining original 40 sheep purchased in 1982, $ 18,000 representing the discounted fair market value of the note received from Dr. Barbara in 1984 (face amount of $ 90,000), and $ 2,000 representing the fair market value of any sheep born of the original breeding herd since 1982. For the return of the sheep, Dr. Barbara charged petitioner a commission in the amount of $ 40,000. Pursuant to a contemporaneously executed agreement, petitioner also transferred by quitclaim deed an undivided 20 percent interest in a parcel of real estate owned by petitioner. The real estate transferred was subject to an existing indebtedness. In return for the transfer, Dr. Barbara agreed to release petitioner from any and all obligations outstanding from petitioner in connection with the sheep activity, including any promissory notes, veterinary fees, past commissions, feed costs, and boarding charges. The transfer of the undivided 20 percent interest in the property by petitioner relieved petitioner of indebtedness in the amount of $ 24,723. The contract of sale transferring the real estate was subject to the express condition that Dr. Barbara "fully [supports] and [maintains] *382 [petitioner's] tax write off in connection with said sheep transaction presently under IRS audit." On their return for 1986, petitioners reported $ 60,000 as income received from the sale of the sheep to Dr. Barbara. Petitioners claimed a basis of $ 52,000 in the sheep that were sold. This resulted in a net reported gain in the amount of $ 8,000. Petitioners did not report any income resulting from the discharge of the indebtedness associated with the transfer of the undivided 20-percent interest in the real property to Dr. Barbara. Also on their return for 1986, petitioners claimed a general business credit of $ 1,670, which was used to offset taxes on the 1986 return. Petitioners also filed Form 1045, Application for Tentative Refund, on which petitioners claimed a refund for the taxable year 1984 resulting from a carryback of an unused general business credit from 1986 in the amount of $ 1,670. On August 21, 1991, respondent issued a statutory notice of deficiency to petitioners. In the notice, respondent determined deficiencies in and additions to petitioners' 1982, 1983, 1984, 1985, and 1986 Federal income tax in regard to the disallowance of the farm losses reported *383 for each of the years in question, the inclusion of unreported interest and dividend income received by petitioners, [2] the disallowance of the investment tax credit claimed by petitioners on their 1982 return, the disallowance of the cost basis of the sheep upon the return of the sheep in 1986, and the inclusion of $ 24,723 in income for the year 1986 resulting from the cancellation of indebtedness upon petitioner's transfer of a 20-percent interest in the real property to Dr. Barbara. In addition to the notice of deficiency, respondent has disallowed the claim for refund by petitioner filed on Form 1045, for the carryback of an unused general business credit from 1986 to the taxable year 1984. OPINION Petitioners claim that the investment in the sheep program was an activity engaged in for profit *384 within the meaning of section 183, and that the losses and expenses therefrom are deductible under either section 162 or section 212. Petitioners further claim that since the investment was an activity engaged in for profit, the investment credit claimed in 1982 arising from the investment should be allowed. With respect to the taxable year 1986, petitioners argue that the income from the sale of the remaining sheep back to Dr. Barbara was accurately reported and properly substantiated. . Petitioners also argue that the transfer of the 20-percent undivided interest in the real property to Dr. Barbara did not relieve them of any indebtedness associated with the property; therefore, the determination by the Commissioner that they should report $ 24,723 as income from the debt discharge is incorrect. Finally, petitioners assert that they are not liable for any additions to tax for negligence, substantial understatement, or for engaging in a tax-motivated transaction, because they exercised due care in their investment, have shown substantial authority for their positions, and have shown that the sheep investment was not a "sham" transaction. Respondent's position is that petitioner's *385 sheep activity is an activity not engaged in for profit during the taxable years 1982 through 1986, and that the losses and expenses related thereto are not deductible under either section 162 or section 212. In addition, since the sheep activity is an activity not engaged in for profit, respondent's position is that petitioners should not be allowed an investment credit with respect to their investment in the sheep program in 1982. Respondent also argues that petitioners have improperly reported income from the sale of the sheep back to Dr. Barbara in 1986, and that petitioners have failed to properly substantiate the cost basis of the sheep in computing their gain from that transaction. Respondent further takes the position that petitioners have failed to report income under section 61 resulting from a forgiveness of indebtedness upon the assignment of a 20-percent interest in real property owned by petitioners, such real property being subject to indebtedness from which petitioners were relieved. As to the carryback of the unused general business credit from 1986 to 1984, respondent claims that petitioners received full benefit for credit in 1986 and, therefore, the carryback *386 of the credit to 1984 and claim for a refund is improper. Finally, respondent argues that petitioners are liable for the additions to tax for negligence or intentional disregard of rules or regulations, substantial understatement of tax, and having engaged in a tax-motivated transaction. Issue 1. Whether the sheep investment has economic substance.
Petitioners claim that the investment in the sheep program was an activity engaged in for profit within the meaning of section 183, and that the losses and expenses therefrom are deductible under either section 162 or section 212. As a general rule, the Commissioner's determinations are presumed correct, and the taxpayers bear the burden of proving that the determinations are erroneous and that they are entitled to the claimed deductions and credit. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Before determining whether a particular activity arises from or is connected with a trade or business, it must first be established that the transaction in question is bona fide and not a "sham." A "sham" transaction is one that lacks economic substance beyond the creation of tax benefits. *387 Knetsch v. United States, 364 U.S. 361 (1960); Karr v. Commissioner, 924 F.2d 1018, 1022-1023 (11th Cir. 1991), affg. Smith v. Commissioner, 91 T.C. 733 (1988). For a transaction to be recognized for tax purposes, petitioner must show that his investment was not motivated or shaped solely by tax avoidance features that have meaningless labels attached, is compelled or encouraged by business or regulatory realities, and has economic substance independent of the apparent tax shelter potential. Frank Lyon Co. v. United States, 435 U.S. 561 (1978); Hilton v. Commissioner, 74 T.C. 305 (1980), affd. per curiam 671 F.2d 316 (9th Cir. 1982). It is a long-settled rule of law that transactions that have no business purpose or economic substance other than the creation of income tax losses or credits are to be disregarded for tax purposes. Knetsch v. United States, supra at 366; Gregory v. Helvering, 293 U.S. 465, 469-470 (1935); Killingsworth v. Commissioner, 864 F.2d 1214, 1216 (5th Cir. 1989), *388 affg. Glass v. Commissioner, 87 T.C. 1087 (1986); Boynton v. Commissioner, 649 F.2d 1168, 1172 (5th Cir. 1981), affg. 72 T.C. 1147 (1979); Rasmussen v. Commissioner, T.C. Memo. 1992-212. "Therefore, when taxpayers resort to the expedient of drawing up documents to characterize transactions contrary to objective economic realities and which have no economic significance beyond expected tax benefits, the particular form they employed is disregarded for tax purposes." Rasmussen v. Commissioner, supra; Frank Lyon Co. v. United States, supra at 572; Falsetti v. Commissioner, 85 T.C. 332, 347 (1985). The material facts with respect to the economic substance of the transaction before us do not differ significantly from those in our earlier decisions in Cherin v. Commissioner, 89 T.C. 986 (1987), Rasmussen v. Commissioner, supra, Jacobs v. Commissioner, T.C. Memo. 1985-609, *389 Siegel v. Commissioner, T.C. Memo. 1985-441, and Hunter v. Commissioner, T.C. Memo. 1982-126. In fact, many of the factors which supported our holdings in Cherin, Rasmussen, Jacobs, Siegel, and Hunter are present in the case at issue here. First, Dr. Barbara, the promoter of the sheep program, completely controlled the structure of the program. Second, there is no indication that there was any negotiation of the price or terms of any of the elements of the transaction. Third, petitioners knew practically nothing about breeding or farming sheep, and the record does not indicate that they made any significant effort to enlighten themselves on the subject prior to or after entering the program. Fourth, the "purchase price" was paid with nonrecourse promissory notes that were disproportionately large with respect to the total purchase price. Fifth, after investing their money, petitioners evidenced little interest in the profitability of the sheep. There is also significant evidence in the record that indicates the parties did not treat the transaction as a sale. In order to constitute a sale or transfer *390 of ownership for Federal tax purposes, the benefits and burdens of ownership must pass from seller to the buyer. Cherin v. Commissioner, supra at 996-1000; Houchins v. Commissioner, 79 T.C. 570, 591 (1982); Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1237-1238 (1981); Estate of Franklin v. Commissioner, 64 T.C. 752, 763-770 (1975), affd. on other grounds 544 F.2d 1045 (9th Cir. 1976); Harmston v. Commissioner, 61 T.C. 216, 228-231 (1973), affd. per curiam 528 F.2d 55 (9th Cir. 1976). The question of whether a sale has occurred must be resolved by ascertaining the intention of the parties as evidenced by the written agreements and by all of the relevant facts and circumstances. Reinberg v. Commissioner, 90 T.C. 116, 132 (1988); Grodt & McKay Realty, Inc. v. Commissioner, supra at 1237; see also Durkin v. Commissioner, 87 T.C. 1329, 1367 (1986), affd. 872 F.2d 1271 (7th Cir. 1989). *391 Factors to be considered in determining whether a sale has occurred include: (1) Whether legal title is transferred to the buyer. Oesterreich v. Commissioner, 226 F.2d 798, 802 (9th Cir. 1955), revg. a Memorandum Opinion of this Court; Commissioner v. Segall, 114 F.2d 706, 709 (6th Cir. 1940), revg. 38 B.T.A. 43 (1938); (2) whether the right of possession is vested in the purchaser, Commissioner v. Segall, supra at 709; (3) which party to the transaction bore the risk of loss or damage to the property, Harmston v. Commissioner, supra at 230; (4) which party receives the profits from the operation and sale of the property, Id. at 229-230; (5) whether an equity is acquired in the property, Haggard v. Commissioner, 241 F.2d 288, 289 (9th Cir. 1956), affg. 24 T.C. 1124 (1955); and (6) how the parties treat the transaction, Grodt & McKay Realty, Inc. v. Commissioner, supra at 1238. The testimony and evidence *392 verifies that the parties did not treat the transaction as a sale although all documentation associated with the transaction refers to a sale. Title to the sheep was never transferred to petitioners. Possession of the sheep was never transferred to petitioners, but remained with Dr. Barbara throughout the years at issue. With regard to who bore the risk of loss, the documents and evidence presented at trial show that Dr. Barbara did; Dr. Barbara's sole recourse for payment of the note consisted of the sheep, their progeny, and any net gains from the sale of the sheep and notes existing from the sale of the sheep and their progeny. The record also shows that Dr. Barbara, and not petitioners, controlled the disposition of any profits received from the sale of the sheep, requiring any net gains from the sale of the sheep to be applied to the outstanding balance on the note. Petitioners were also apparently unaware that they had not even purchased 40 sheep as the record clearly reflects that 4 of the sheep were duplicated on the charts for unit #1 and unit #2, resulting in only 36 sheep being involved in the transaction. Finally, the documents surrounding the original transaction *393 in 1982 required that Dr. Barbara provide monthly accountings with respect to the sheep; however, no evidence was presented of any such accountings (other than invoices for monthly maintenance fees), nor was evidence provided to indicate that petitioners had at least requested the monthly accountings. Petitioners argue that the fact that they actually paid out-of-pocket, sizable amounts as maintenance fees and interest expenses indicates that they owned the sheep and entered into the investment with the necessary profit motive. The characterization of the amounts paid is merely an exercise in labeling. Dr. Barbara was well paid for arranging an attractive package of tax benefits for petitioners. Between December 15, 1982, and December 26, 1986, Dr. Barbara received over $ 100,000 in actual cash payments from petitioners. On the basis of the record before us, we conclude that petitioners willingly made payments solely for the tax benefits they might receive from the deal. Within a very few years, petitioners received tax benefits well in excess of their total cash expenditures and would continue to retain such benefits. Here, as in Knetsch v. United States, 364 U.S. 361, 363 (1960), *394 what petitioners paid for was hoped for tax deductions. The entire transaction is a sham entered into solely to obtain tax benefits. Petitioners also argue that the sheep venture is a trade or business for tax purposes if they have a good faith expectation of profit from the venture. Citing Mercer v. Commissioner, 376 F.2d 708 (9th Cir. 1967), revg. T.C. Memo. 1966-82, they stated that the good faith standard applies irrespective of whether others might view that expectation as reasonable. We need not reach the merits of this argument as we have already found that the transaction at issue lacks economic substance. In Cherin v. Commissioner, 89 T.C. 986, 993-994 (1987), we held that the presence of a profit motive does not require the recognition for tax purposes of a transaction which lacks economic substance, stating that: We have never held that the mere presence of an individual's profit objective will require us to recognize for tax purposes a transaction which lacks economic substance. The economic substance of a business transaction and the intent, purpose, or motive of an individual *395 investor, while sometimes equated, are not identical. A business transaction by its very nature must have economic substance, that is, a realistic potential for profit * * * Realistic potential for profit is found, * * *, when the transaction is carefully conceived and planned in accordance with standards applicable to the particular industry, so that judged by those standards the hypothetical reasonable businessman would make the investment. The intent or purpose, which motivates an individual to enter into a business transaction refers to the subjective state of mind of the particular taxpayer before the Court. Subjective intent cannot supply economic substance to a business transaction. Where, as in the case at bar, we examine the transaction and conclude as we do in this case that * * * investment packages lack any realistic potential for profit, we need not examine the investor's state of mind. * * * [Fn. refs. omitted.]
See also Gardner v. Commissioner, 954 F.2d 836, 839 (2d Cir. 1992), affg. per curiam Fox v. Commissioner, T.C. Memo. 1988-570. Based on this reasoning, we have consistently held that, even *396 if a taxpayer invests with the objective of making a profit, any loss sustained on that investment will not be recognized for tax purposes if the overall transaction lacks economic substance. Omerza v. Commissioner, T.C. Memo. 1992-113, affd. without published opinion 999 F.2d 540 (6th Cir. 1993); Illes v. Commissioner, T.C. Memo. 1991-449, affd. per curiam 982 F.2d 163 (6th Cir. 1992); Jackson v. Commissioner, T.C. Memo. 1991-250, affd. 966 F.2d 598 (10th Cir. 1992); see also Shriver v. Commissioner, 899 F.2d 724 (8th Cir. 1990), affg. T.C. Memo. 1987-627; Mahoney v. Commissioner, 808 F.2d 1219 (6th Cir. 1987), affg. Forseth v. Commissioner, 85 T.C. 127 (1985). In summary, therefore, we hold that under the factual circumstances of this case, where petitioners have gone to great lengths to clothe in "sales" garb transactions that are not sales, and where petitioners' only real expectations *397 of profit rest on the hoped for tax benefits, the transactions do not have sufficient substance apart from tax manipulation to be recognized for tax purposes. Therefore, respondent's determinations disallowing the farm losses are sustained. Issue 2. Whether petitioners are entitled to investment tax credit in the amount of $ 20,000 for the taxable year 1982
On brief, petitioners present a number of arguments addressing whether they are entitled to their claimed investment tax credit for 1982. Those arguments were primarily directed toward whether petitioners were engaged in the sheep program with an actual and honest objective of making a profit. However, having held that the transaction before us lacks economic substance, it is unnecessary for us to address profit-objective issues again. Based on the record before us, we have concluded that petitioners are not entitled to the amounts claimed as depreciation or maintenance fees, since they made no purchase of the sheep. Since no sale of sheep was in substance made to petitioners, it follows that petitioners are not entitled to an investment credit with respect to the sheep. We therefore find that the claimed investment *398 tax credit for the taxable year 1982 is not allowable and respondent's determination is sustained. Issue 3. Whether petitioners are entitled to a general business credit carryback in the amount of $ 1,670 from the taxable year 1986 to the taxable year 1984.
Petitioners claimed a credit in the amount of $ 1,670 on their Federal income tax return for 1986 which was used to reduce their tax liability for that year. On Form 1045, Application for Tentative Refund which was filed on or about October 28, 1987, petitioners claimed a refund for the taxable year 1984 due to the carryback of an "unused general business credit" from 1986 in the amount of $ 1,670. Attached to the Form 1045 was a copy of petitioners' 1986 Federal income tax return and a copy of Form 3468, Computation of Investment Credit, for the taxable year 1986. It is evident by even a cursory review of the 1986 Federal income tax return that an Investment Tax Credit in the amount of $ 1,670 was computed for the taxable year 1986, and that the entire credit was used in full to offset taxes due for that year. We fail to see where there is an "unused general business credit" originating in the taxable year 1986 which *399 could be carried back for the purpose of claiming a refund. Additionally, petitioners failed to present any evidence reflecting the nature of this credit or substantiating their entitlement to it. Petitioners failed in their burden of proof; therefore, we hold that the respondent's determination disallowing the refund is sustained. Rule 142 (a); Welch v. Helvering, 290 U.S. 111 (1933). Issue 4. Whether petitioners properly reported income received from the sale of sheep in taxable year 1986.
On their return, petitioners reported a sale of the remaining sheep, listing $ 60,000 as the sale price, offset by a $ 52,000 basis in the sheep, resulting in a net gain of $ 8,000. Respondent argues that petitioners submitted no tangible evidence supporting the cost basis claimed on the return and deny petitioners an offset for basis. Because petitioners failed to provide any evidence to substantiate the amount claimed as the cost basis of the sheep sold in 1986, respondent argues the total amount realized from the sale should represent the gain recognized. In the Court's opinion, the resolution of this issue centers on whether a sale actually occurred *400 in 1982 whereby petitioners obtained title to and a cost basis in the sheep so that they could sell them back to Dr. Barbara in 1986 and take an offset on the sale for cost basis. We earlier examined the substance of the sheep transactions and concluded that they had no practicable economic effect other than the creation of tax benefits. Although the original contracts between petitioner Taki Anagnoston and Dr. Barbara characterized the transfer of the sheep as a sale, that designation is not conclusive. Frank Lyon Co. v. United States, 435 U.S. 561, 573-574 (1978). The economic substance of a transaction purporting to be a sale, and not its form, governs for Federal tax purposes. Frank Lyon Co. v. United States, supra; Owens v. Commissioner, 568 F.2d 1233 (6th Cir. 1977), affg. in part and revg. in part 64 T.C. 1 (1975); Hulter v. Commissioner, 91 T.C. 371 (1988). A transaction must have a purpose and a substance apart from anticipated tax consequences in order to be recognized for tax purposes. Knetsch v. United States, 364 U.S. 361 (1960); *401 Hulter v. Commissioner, supra at 388. Viewed in their entirety, the contracts between petitioners and Dr. Barbara do not support a finding that the requisite benefits or burdens of ownership of the sheep were transferred to petitioners. The failure to acquire the benefits and burdens of ownership supports our conclusion that no sale of sheep occurred for tax purposes in 1982. It follows then that the receipt in 1984 of the note from Dr. Barbara had no economic substance, because petitioners had nothing to sell. Thus, the purported return of the remaining sheep in 1986 along with the note from Dr. Barbara was not a sale of sheep and has no tax effect whatsoever. We find the reporting of the sale of the sheep by petitioner to Dr. Barbara in the taxable year 1986 is without substance; therefore, the entire transaction is to be ignored. Based on the foregoing, we hold that petitioners need not include the $ 60,000 in gross income nor can they offset the $ 52,000 as basis. Issue 5. Whether petitioners failed to report proceeds received from a transfer of a 20-percent undivided interest in real property in the taxable year 1986.
In the notice *402 of deficiency, respondent determined a deficiency in petitioners' Federal income tax due to petitioners' failure to report income from a discharge of indebtedness which occurred when petitioners transferred a 20-percent undivided interest in real property owned by petitioners to Dr. Barbara. The 20-percent undivided interest in the real property that was transferred was subject to an existing debt in the amount of $ 24,723. The exhibits and testimony before the Court show that the 20-percent undivided interest in the real property was transferred to Dr. Barbara and that the consideration to be paid by Dr. Barbara was the "forgiveness of the obligations of Seller [petitioners] to Buyer [Dr. Barbara] and the assumption by Buyer, in connection with the sheep venture of the parties hereto as set forth in that certain agreement between the parties hereto dated December 26, 1986." The contract of sale further states that, "Buyer acknowledges that said real property herein conveyed is subject to encumbrances of record. Buyer agrees to faithfully pay and satisfy his pro rata share of all encumbrances of record on the dates they fall due." We find that there was not a discharge of indebtedness *403 occurring as respondent contends. Instead, we find that a sale of a 20-percent undivided interest in real property occurred with the sellers (petitioners) receiving as consideration for the sale the assumption of the liability associated with such real property by the buyer (Dr. Barbara) and the forgiveness of any obligations of petitioners in connection with the sheep venture to Dr. Barbara. [3] As the record shows, petitioners did not have any genuine indebtedness to Dr. Barbara in connection with the sheep venture. Nor was evidence presented to indicate that there were any bona fide obligations on the part of petitioners due to Dr. Barbara for unpaid maintenance or upkeep of the sheep. Therefore, petitioners realized proceeds from the sale of the 20-percent undivided interest in the real property equal to the assumption of the debt associated with the property transferred to Dr. Barbara, or $ 24,723. See Smith v. Commissioner, 324 F.2d 725 (9th Cir. 1963), affg. T.C. Memo. 1962-128. *404 Since the substance of this transaction is in reality a sale of real property, petitioners should be allowed their cost basis in the property sold. Petitioner Taki N. Anagnoston testified at trial that he paid $ 125,000 for one 500-acre tract; however, there was no evidence presented to substantiate petitioners' basis in the remainder of the property comprising the 1,500 acres that was the subject of the transfer. The 20-percent interest that was transferred to Dr. Barbara was in the entire 1,500-acre tract of land owned by petitioners. We find that petitioners should be allowed an offset against the sales proceeds realized, a cost basis equal to 20 percent of $ 125,000, or $ 25,000. Since petitioners realized proceeds of $ 24,723 from the sale of this 20-percent undivided interest in the 1,500 acres, petitioners have a loss on the sale of $ 277. In addition, since the property that was sold qualifies as a capital asset and has been held longer than 1 year, the loss should be treated as a long-term capital loss under section 1221. Accordingly, we find that petitioners sold a 20-percent undivided interest in 1,500 acres to Dr. Barbara for the consideration of Dr. Barbara's assumption *405 of outstanding indebtedness associated with the property. Petitioners have realized a loss on this transaction totaling $ 277 and such loss must be recognized. Since the property has been held longer than one year at the date of sale, the loss on the sale constitutes a long-term capital loss. Therefore, we hold that respondent's determination that petitioners recognize ordinary income of $ 24,723 from the cancellation of indebtedness is not sustained, and we hold that petitioners must recognize a capital loss of $ 277 from the sale of the land. Issue 6. Whether petitioners are liable for the additions to tax for negligence or intentional disregard of the rules or regulations pursuant to section 6653(a)(1) and (2) with respect to the taxable years 1982 through 1985, and pursuant to section 6653(a)(1)(A) and (B) with respect to the tax year 1986.
In the notice of deficiency, respondent also determined that petitioners are liable for additions to tax for negligence. For taxable years prior to 1986, section 6653(a)(1) imposes an addition to tax equal to 5 percent of the underpayment of tax if any part of the underpayment is due to negligence or intentional disregard of rules *406 or regulations. In addition, for taxable years prior to 1986, section 6653(a)(2) imposes an addition to tax in the amount of 50 percent of the interest due on the portion of the underpayment attributable to negligence. Section 6653(a)(1) and (2) was repealed by section 1503(a) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2742-2743, effective for returns due after December 31, 1986. The repealed section was replaced by section 6653(a)(1)(A) and (B), the provisions of which call for the same additions to tax as the repealed section. Negligence is defined as the lack of due care or failure to do what a reasonable and ordinarily prudent person would do under the circumstances. Zmuda v. Commissioner,731 F.2d 1417, 1422 (9th Cir. 1984), affg. 79 T.C. 714 (1982); Neely v. Commissioner,85 T.C. 934, 937 (1985). Respondent's determination that petitioners were negligent is presumed correct, and petitioners bear the burden of proving that they were not negligent. Rule 142(a); Betson v. Commissioner,802 F.2d 365, 372 (9th Cir. 1986), affg. in part *407 and revg. in part T.C. Memo. 1984-264; Bixby v. Commissioner,58 T.C. 757, 791-792 (1972). Petitioners contend that they were not negligent because they sought the professional advice of their accountant, and the accountant confirmed the deductibility of the expenses of the sheep investment before they went forward with the investment. Petitioners argue that the advice from their accountant warning petitioners to stay away from the investment was merely personal advice not rendered in a professional context; therefore, petitioners did not feel obligated to follow the advice. The record before the Court clearly shows that the accountant began his communication to petitioners with the warning that the program was "amateur" and that it could be attacked by the IRS for lack of profit motive. In closing his opinion letter, the accountant tells petitioners to stay with real estate and medicine. From the record, it is clear that petitioners placed all of their reliance on Dr. Barbara's representations, and chose to ignore the clear and unambiguous warnings of their accountant. Petitioners have failed to show and the record *408 before us does not support a finding that petitioners relied on the advice of competent professionals and unbiased parties. Rather, the advice of the most competent adviser sought out, the accountant, was ignored, and the representations of Dr. Barbara were followed. Dr. Barbara was the promoter of the sheep program and, as such, stood to directly profit from petitioners' investment in the program. We cannot say that reliance on advice given by the promoter of the program amounts to reasonable and prudent conduct. We have held that the failure of a taxpayer to make a meaningful investigation beyond the promotional materials supplied by a promoter or sales person was not reasonable or in keeping with what a reasonably prudent person would do. LaVerne et al. [4] v. Commissioner,94 T.C. 637, 652 (1990), affd. without published opinion 956 F.2d 274 (9th Cir. 1992), affd. without published opinion sub nom. Cowles v. Commissioner,949 F.2d 401 (10th Cir. 1991). Petitioners have failed to make a showing to overcome the addition to tax for negligence or intentional disregard of rules or regulations. *409 Therefore, we hold respondent's determinations with respect to the additions to tax for negligence for the taxable years 1982, 1983, 1984, and 1985 are sustained. Since petitioners no longer have an underpayment of tax with respect to the taxable year 1986, respondent's determination for 1986 is not sustained. Issue 7. Whether petitioners are liable for the additions to tax for substantial understatement of their tax liabilities pursuant to section 6661 with respect to the taxable years 1982 through 1986.
Section 6661(1) provides that a taxpayer whose income tax return contains a substantial understatement of tax may be liable for an addition to tax equal to 25 percent of the underpayment attributable to such understatement. Pallottini v. CFommissioner,90 T.C. 498 (1988). A "substantial understatement" is defined as an understatement *410 which exceeds the greater of $ 5,000 or 10 percent of the amount of tax required to be shown on the return. Sec. 6661(b)(1). In calculating understatements of tax under section 6661(a), items for which there is substantial authority wor with respect to which all relevant facts were adequately disclosed on the tax return are not to be considered. Sec. 6661(b)(2)(B). However, in the case of a tax shelter, even full disclosure in the tax return will not exclude an item from the calculation for the addition to tax. Sec. 666(b)(2)(C)(i). For this purpose section (b)(2)(C)(ii) defines a tax shelter as many partnership, entity, or other plan or arrangement the principal purpose of which is the avoidance of Federal income tax. We find the sheep investment program at issue is a tax shelter for purpsoes of section 6661. Petitioners argue that the section 6661 penalty should not apply because they have shown that they have substantial authority for their positions and have made adequate disclosure. As stated above, in the case of a tax shelter, full disclosure in the tax return does not reduce the addition to tax under section 6661. As to the issue of substantial authority, we know *411 of no such authority inasmuch as we have found that the transaction lacked economic substance. In addition, petitioners have not disclosed any authority other than their broad statements about the section 183 regulations, and such regulations are not dispositive here in light of our finding that there is no economic substance to the transaction. For this reason, we find that petitioners are subject to the additions to tax under section 6661 for each of the taxable years 1982, 1983, 1984, and 1985. Since petitioners no longer have an understatement of tax for the taxable year 1986, respondent's determination for the addition to the tax for that year is not sustained. Issue 8. Whether petitioners' involvement in the sheep activity during the taxable years 1982 through 1986 was a tax-motivated transaction under section 6621.
Section 6621(c)(1) provides that, if there is a "substantial underpayment attributable to tax-motivated transactions," the interest payable under section 6601 "shall be 120 percent of the underpayment rate". A substantial underpayment attributable to a tax-motivated transaction means "any underpayment of taxes * * * attributable to 1 or more tax-motivated *412 transactions if the amount of the underpayment for such year * * * exceeds $ 1,000." Sec. 6621(c)(2). The term "tax-motivated transactions" means, inter alia, "any sham or fraudulent transaction." Sec. 6621(c)(3)(v). From a literal reading of the statute, if a transaction is determined to be a "sham," and the underpayment attributable to the transaction exceeds $ 1,000, the increased interest rate applies. In Freytag v. Commissioner,89 T.C. 849, 887 (1987), affd. 904 F.2d 1011 (5th Cir. 1990), affd. on other grounds 501 U.S. 868 (1991), we sustained the Commissioner's determinations that section 6621(c) applied to underpayments based on the finding that the transactions at issue were "shams." The increased interest rate applies to interest accrued after December 31, 1984, even though the transaction was entered into prior to that date. Solowiejczyk v. Commissioner,85 T.C. 552 (1985), affd. without published opinion 795 F.2d 1005 (2d Cir. 1986). Petitioners assert that the transaction at issue does not involve a "sham" transaction. They *413 state that they hoped to obtain not only profits from the transaction, but also the benefit of a closer association with Dr. Barbara as a medical colleague. Although petitioners do not cite any authority for this contention, we note the holdings in Heasley v. Commissioner,902 F.2d 380 (5th Cir. 1990), revg. T.C. Memo. 1988-408 and Freytag v. Commissioner, supra, and distinguish between the two. In Heasley, this Court found that the transactions entered into were not entered into for profit, and, therefore, under section 301.6621-2T Q&A-4, Temporary Proced. & Admin. Regs., 49 Fed. Reg. 50392 (Dec. 28, 1984), the increased interest under section 6621(c) was applicable. The Court of Appeals for the Fifth Circuit concluded, however, that the taxpayers had "the requisite profit motive," and reversed the Tax Court. Heasley v Commissioner, supra at 386. In Freytag v. Commissioner, supra, we held that the transactions were not entered into for profit in the alternative, and sustained the additional interest under section 6621(c) on the primary ground that the *414 alleged transactions factually were illusory and fictitious, i.e., "shams", a finding which was affirmed by the Court of Appeals for the 5th Circuit in Freytag v. Commissioner, 904 F.2d at 1015-1016. It is upon that ground that we sustain respondent's determination here. When a transaction is the simple product of smoke and mirrors, it is a factual "sham", regardless of whether the taxpayer may have thought that a profit might have been made. Chamberlain v. Commissioner,T.C. Memo. 1994-228; See Cherin v. Commissioner, 89 T.C. 986, 993-994 (1987). This is all that section 6621(c)(3)(v) requires. See Statement of the Managers attached to the conference report, H. Conf. Rept. 99-841 II-796 (1986), 1986-3 C.B. (Vol. 4) 796. We therefore hold that the transaction at issue here is a tax-motivated transaction which falls within the scope of section 6621(c)(3)(A)(v), and petitioners are liable for the increased interest. Respondent's determinations with respect to the increased interest under section 6621(c) are sustained for the taxable years 1982, 1983, 1984, and *415 1985. Since petitioners no longer have an underpayment with respect to the taxable year 1986, petitioners are not liable for the increased interest for that year. To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. 50 percent of the interest on the entirety of the deficiency.↩
1. All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.↩
2. Prior to trial, respondent and petititioners stipulated that the determination of additional tax for unreported interest and dividends for the taxable years 1982, 1983, and 1984 is correct, and as such, it is so found.↩
3. The Court, on its own initiative, questioned counsel for respondent, Ms. Kingston, concerning the characterization by the Commissioner of the release of the indebtedness as cancellation of indebtedness income. The following discussion, in pertinent part, took place beginning at page 26 of the transcript: MS. KINGSTON: * * *. Our position on that is that there was a certain portion of the original indebtedness on the contract [that] was released in consideration of the transfer of the property. * * * THE COURT: Well, I guess the problem I'm having is, if you extinguish a debt for something that is worth an amount equal to the debt, then is there a forgiveness of indebtedness issue? MS. KINGSTON: It's our position that there is in this instance, Your Honor. * * * THE COURT: All right. If he transferred $ 24,000 in money to pay off this debt, you wouldn't be saying he had a forgiveness of indebtedness income. You'd say the debt was paid, wouldn't you? MS. KINGSTON: In effect, what happens with the transfer of the property is, there is a taxable event because that creates the discharge of indebtedness. * * *, there is a certain amount of income essentially that comes back. * * * THE COURT: Are you treating it like it was a sale of a piece of the property? MS. KINGSTON: I guess, in effect, there is. There -- * * * - the transfer of that property is a taxable event, * * * because it released a certain portion of the indebtedness * * *.↩
4. Cases of three petitioners were consolidated for purposes of this proceeding: R. George LaVerne, Curt K. Cowles, and Gary M. and DeAnn Gustin.↩